UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil No. 16-____-P-_

CHARLENE RICHARD,                          )
                                           )
                       Plaintiff           )
                                           )
              v.                           )
                                           )
REGIONAL SCHOOL UNIT 57,                   )
                                           )
                       Defendant           )


**COMPLAINT**

Plaintiff Charlene Richard complains against Defendant Regional School Unit 57 as

follows:

**PARTIES AND JURISDICTION**

1.     Plaintiff Charlene Richard resides in Limerick, Maine.

2.     Defendant Regional School Unit 57 ("RSU 57") is the local education agency

providing education to children of the residents of Alfred, Limerick, Lyman, Newfield,

Shapleigh, and Waterboro, Maine.

3.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C.

§ 1331.

4.     Plaintiff filed a charge of retaliation against RSU 57 with the Maine Human

Rights Commission dated June 18, 2015. On December 28, 2015, the Commission dismissed

her charge pursuant to 5 M.R.S. § 4612.

1

## FACTS COMMON TO ALL COUNTS

5.      Plaintiff filed a charge of retaliation against RSU 57 with the Maine Human Rights Commission dated June 18, 2015. On December 28, 2015, the Commission dismissed her charge pursuant to 5 M.R.S. § 4612.

6.      Plaintiff Charlene Richard received her Bachelor of Arts degree in English, with a minor in Business Administration and Economics, from the University of New Hampshire. She attained her teacher certification and received a Master of Science in Education from the University of New England.

7.      Regional School Unit 57 ("RSU 57" or "the District") hired Ms. Richard in March 2006 as a long-term substitute for a third grade classroom. In July 2006, the District hired Ms. Richard as a regular education teacher at the Waterboro Elementary School ("Waterboro").

8.      Ms. Richard taught kindergarten at Waterboro from July 2006 through April 2015, except for the 2010-2011 school year when she taught third grade.

9.      The District currently employs Ms. Richard as a first grade teacher at the Shapleigh Elementary School.

10.     Prior to the events that gave rise to this charge of discrimination, Ms. Richard had never been reprimanded or otherwise disciplined by RSU 57. All her classroom observations had resulted in positive feedback. For example, after observing her classroom on December 19, 2013, Christine Bertinet, then Waterboro's assistant principal, stated: "It is always a pleasure to spend time in your room. Your classroom is so well organized and arranged in a way that maximizes both collaborative and independent learning

2

opportunities." Likewise, after observing her classroom on February 26, 2014, Ms. Bertinet stated: "Your lesson notes are very thorough, well organized, and interdisciplinary in design." Ms. Bertinet commended Ms. Richard for cueing and prompting students, noting "you are very aware of the individual needs of students throughout this lesson."

11.     Ms. Richard also received uniformly positive feedback from parents of her students. For example, on June 28, 2013, in response to the inquiry of a parent whose student had just been assigned to her class, over twenty parents posted positive comments about her on the "Parents of 57" Facebook page, including:

- "LOVE LOVE LOVE Mrs. Richard. . . . My daughter loved her and we loved her as well, she is fun and makes learning fun too . . . ."

- "She is the BEST teacher ever."

- "I give her 5 stars!!"

- "Mrs. Richard is the perfect kindergarten teacher…."

- "My daughter loved her and so did I. She was really great at keeping communication lines open for the parents. . . ."

12.     In her 11 years as a teacher, Ms. Richard has taught several students with special needs. Some students arrive in her kindergarten classroom each year already identified as eligible for receipt of special education services under the Individuals with Disabilities Education Act ("IDEA"). These students each have an Individualized Education Program ("IEP"). Other students lack IEPs upon arrival in her class, but may be suspected of having a qualifying disability under the IDEA or section 504 of the Rehabilitation Act.

13.     For students with suspected disabilities but no IEP, RSU 57 actively discourages teachers from referring them to an IEP Team for an eligibility evaluation and determination. The District requires teachers to go through so many preliminary steps that it is virtually impossible for an unidentified student with a suspected disability to gain IDEA eligibility while still in kindergarten.

14.     Teachers who suspect that a student has any type of qualifying disability initially are required to place the student in a so-called Response to Intervention ("RTI") program. RTI is a three-tiered program designed to modify instruction for a child without a formal diagnosis. In practice, many students with suspected disabilities remain in RTI throughout kindergarten and, often, throughout first grade.

15.     The District will not allow an IEP Team referral to be made if the student is responding to any of the attempted RTI interventions. For example, if the student achieves any of his or her intervention goals (also known as "SMART goals") at the second-tier level of RTI, then that student is returned to a lower tier of intervention. This occurs even if the student has failed to attain all of his or her intervention goals. A student in the District may be referred for a special education evaluation only if he or she does not respond to *any* of the instructional interventions after the third phase of the RTI program.

16.     Similarly, if a teacher suspects that a student has a qualifying disability that is causing behavioral issues, the teacher is initially required to refer the child to the Student Assistance Team ("SAT"), rather than the IEP Team. The SAT consists of school staff only and is designed to develop a plan to address the student's overall educational behavior. In

practice, the SAT process delays formal diagnosis and referral for special education evaluation and eligibility determination.

17.     As a result of these practices, students with qualifying disabilities routinely are not identified for IDEA eligibility at the start of their kindergarten education. As one special education teacher once explained to Ms. Richard, "as long as a student breathes, he or she can pass the [special education] test for under seven [years old], so really it is a total waste of time."

18.     Despite a persistent lack of support and services for unidentified students with special needs, Ms. Richard did her best to manage with the resources provided to her and did whatever she could as a general classroom teacher to help those students succeed.

19.     In March 2014, a new male student, Student 1, transferred to Waterboro and was assigned to Ms. Richard's classroom. At his previous school, Student 1 had displayed odd behaviors such as inappropriate touching of female peers, yelling outbursts that had no apparent trigger, self-isolation, and confusions about reality. His previous teacher informed Ms. Richard that the prior school had planned to have Student 1 tested by its school psychologist, but was unable to do so because he transferred to Waterboro. Ms. Richard shared this information with Assistant Principal Bertinet, but Student 1 was not referred for psychological testing upon arriving in the District.

20.     When Student 1 joined Ms. Richard's kindergarten classroom, his behavioral issues were extremely concerning. He often became violent in class, would yell comments like "Kill! Kill! Die!," draw detailed pictures of people being decapitated and covered in blood, and demonstrate other violent behavior in Ms. Richard's classroom.

21.     Ms. Richard repeatedly asked the Waterboro administrators to provide her with guidance and support for dealing with Student 1's behaviors.  The only guidance she received, however, was an instruction to "buzz" the principal's office whenever Student 1 became violent.

22.     In response, to complaints by parents who had witnessed Student 1's violent outbursts, Waterboro's then-principal, Mark Petersen, instructed Ms. Richard not to allow Student 1 to be in close proximity to any of the students whose parents had complained. His request, however, was impossible to fulfill. Student 1 was hyperactive and would not stay in one place. Monitoring him at all times, while also teaching and managing a classroom of 16 kindergarteners, was neither realistic nor effective.

23.     Within a few days, Student 1 kicked one of the "protected" students under the table. When Ms. Richard reported this incident to Mr. Peterson, he told her that he was "very disappointed in [her]" for allowing Student 1 to sit close to one of the students that was to be treated as "off limits" for Student 1.

24.     The night before this incident, speaking as a parent, Ms. Richard had posted an article on her Facebook account that spoke out against standardized testing for kindergarten students. After reprimanding Ms. Richard for allowing Student 1 to be near the "protected" student, Mr. Petersen stated, "What is this I hear about Facebook? We are going to be discussing this." Ms. Bertinet also told Ms. Richard she would need to speak with her about Facebook.

25.     Upon information and belief, someone with account access then began logging into Ms. Richard's email account to monitor her online communications with

parents. On one occasion, Ms. Richard attempted to log into her school email and was denied access because her password had been changed. Ms. Richard had to contact the school technical department to obtain her new password.

26.    For the 2014 -2015 school year, three students with IEPs were assigned to Ms. Richard's kindergarten classroom. RSU 57 also placed an educational technician, Ruthinian Gregorie, in her classroom specifically to work with these three identified students.

27.    RSU 57 failed to provide Ms. Richard with copies of the IEPs for these three special education students at the beginning of the school year, however, despite her numerous requests. When Ms. Richard finally received the first of the three IEPs in early October, she wrote an email to Ms. Bertinet, who was now the school principal.  Her message stated, "I find it pitiful that it has taken this long, for me his K teacher, to receive the document. I have been actively pursuing it, since August. I, until today, had no information on his goals or necessary class accommodations." Ms. Richard did not receive the IEPs for the other two students with disabilities in her classroom until mid- to late-October.

28.    Within the first two and a half months of the school year, RSU 57 removed Ms. Gregorie from Ms. Richard's classroom on three separate occasions.  On each of these occasions Ms. Richard received no advance notice and no substitute for Ms. Gregorie.  Ms. Richard was left to find coverage on her own, which was neither practical nor effective. This practice of removing the educational technician from the classroom violated the students'

IEPs.  It also violated the teachers' Collective Bargaining Agreement, which states that teachers cannot be required to cover for other teachers, except in case of an emergency.

29.     For the 2014-2015 school year, there were two other students in Ms. Richard's class, Student 2 and Student 3, who did not arrive with IEPs but exhibited significant behavioral challenges. Ms. Richard suspected that each had an underlying disability, but neither of these students had been previously identified as eligible for special education services.

30.     From the beginning of the school year, Student 2 exhibited significant behavioral issues. His typical behaviors included throwing objects at adults or students, swearing at peers, and breaking classroom objects. Later in the school year, Student 2's mother eventually had him tested by a private psychologist, who diagnosed him with Neuro Developmental Disorder.

31.     Student 3's behavior also became disruptive and a cause for concern. Student 3 was overtly sexual with the other learners in her class.  He touched the female students' hips and behinds. He would rub his penis area while looking at classmates and sucking on a chewy toy. He also intentionally hurt other students in the classroom.  For example, Ms. Richard observed Student 3 walk across the room to intentionally kick a peer who was not engaging with him in any way.  Ms. Richard also observed Student 3 step on a student's fingers and smile when the student yelled out in pain.

32.     Ms. Richard reported Student 2's and Student 3's behavioral issues to both Principal Bertinet and the new assistant principal, Melissa Roberts.  Ms. Richard requested

from both of them the paperwork necessary to refer both students to the Student Assistance Team.

33.     In response to Ms. Richard's continued requests for guidance to address Student 2's and Student 3's behaviors, Waterboro's behavior strategist, Nicole Winthrop, created a behavior chart for both students. Ms. Richard completed the chart for both students daily, recording all of the appropriate data.

34.     Ms. Winthrop also created a behavior support plan for Student 2, but not for Student 3.  The behavior plan for Student 2 included coaching him before, during, and after every transition. Ms. Richard followed the behavior plan dutifully, even though it took a lot of time away from instructing the rest of her class. In an effort to help Student 2 transition in the mornings, Ms. Winthrop was supposed to meet with him personally three times a week. This never occurred.

35.     Despite the behavior support plan and behavioral data charts, both Student 2 and Student 3 continued to misbehave and hurt students in Ms. Richard's classroom on a daily basis. Two students in particular, Student 4 and Student 5, were frequent targets of their negative behaviors.

36.     Student 2 and Student 3 often targeted other students in a unified manner. For instance, Ms. Richard observed them act in consortium to hit Student 4, take his pencil out of his hand, say swear words to him, and taunt him. On one occasion, Student 2 even threw a chair at Student 4's head.

37.     Student 3 also bullied Student 5. For example, the hot water in the school reached 140 degrees. Teachers had been asking the school to regulate the temperature for

9

years, but nothing had been done in response to these requests. Ms. Richard taped down the hot water handle in her classroom to prevent students from using it, and she constantly instructed her students not to touch the hot water handle. Her students all knew the hot water was off limits. On October 31, 2014, however, Student 3 disobeyed, turned on the hot water tap, and invited Student 5 to go wash her hands. Student 5's hands were burned and inflamed as a result.

38.     On November 19, 2014, Ms. Richard received an email from Ms. Bertinet stating she had been informed that Ms. Richard had "escorted one of [her] students to the [break room] and secluded him." Her email asked if Ms. Richard had written a seclusion report or contacted the parents of the child. The email indicated that "Nicole Winship [the behavior coach] must be involved in all decisions regarding the use of this break space. This is something that has been mentioned previously and needs to be followed."

39.     Ms. Richard explained to Ms. Bertinet that she had neither instructed anyone to seclude the student, Student 2, nor had she been present for any seclusion. Ms. Bertinet's email also caused Ms. Richard to revisit the school's policies on time out rooms, which she understood to have been developed to comply with the law. In her reply email, Ms. Richard pointed out that in the past she had observed Ms. Winship "holding the [break room] door closed with a student in the room and [had] heard her talking to the janitor about removing the inside handle" when disciplining another child.  These actions were alarming and appeared to be in direct violation of RSU 57's policy prohibiting staff from "secur[ing] the door to that room in any manner, including holding the door so as to keep the student shut

10

in that room." Ms. Richard copied the Union Representative on the email, and Ms. Bertinet questioned why Ms. Richard had written the email and copied the Union Representative.

40.     On December 2, 2014, Student 5 reported to Assistant Principal Roberts and Ms. Richard that Student 3 had tried to pull down her pants and underpants three times. Ms. Roberts told Ms. Richard that she would speak with Student 3 and "make some phone calls." Ms. Richard was worried about Student 5, so she called her parents that evening to make sure she was okay. Ms. Richard was shocked when they informed her that no one from the administration had contacted them that day or after any other incident in which Student 5 had been victimized.

41.     After that conversation, Student 5's parents sent an email to the school expressing their concern for their child's safety so long as Student 3 remained in the classroom.  Ms. Richard wrote to Ms. Bertinet to reiterate what she had been reporting all along:  that Student 3 was hurting other students in her classroom on a daily basis. At least eight families had mentioned his name to Ms. Richard at their conferences, and another student already was not allowed to be near Student 3.

42.     Ms. Bertinet responded to Ms. Richard's email by proposing a team meeting. This team meeting never took place, however.

43.     On December 3, 2014, Ms. Richard made a referral of Student 2 and Student 3 to the Student Assistance Team. Ms. Richard sincerely believed that both were suspected students with a disability that needed to be evaluated for eligibility to receive specialized services appropriate to address their unique needs. Ms. Richard also made this referral because she had reasonable cause to believe that continuation of the current situation in her

11

classroom, given their violent and disruptive behavior, would place the health or safety of other students under her care at significant risk.

44.     Ms. Richard had been asking Assistant Principal Roberts for the Student Assistance Team referral paperwork for months, but Ms. Roberts never provided it to Ms. Richard. Ms. Richard finally decided to download a copy that she had used in a prior year as a template to make the referrals.

45.     Two days later, on December 5, 2014, Ms. Richard received an email from Superintendent John Davis.  It stated that he had received emails from parents of students in her classroom expressing "concerns about the classroom and the conduct of the 5 year olds in the room." He requested to meet with Ms. Richard to "discuss the issues and what our staff is doing about these concerns." Superintendent Davis invited union representative Clinton Nash to attend the meeting with Ms. Richard.

46.     Ms. Richard, accompanied Clinton Nash, met with Superintendent Davis, Principal Bertinet, and Assistant Principal Roberts on December 8, 2014.

47.     At this meeting, Superintendent Davis immediately accused Ms. Richard of being incapable of managing her classroom. He subjected Ms. Richard to a litany of insults and threats, stating that parents had been complaining about her for years, that she was pathetic for not being able to handle 22 students, that terminating her would be a waste because the school had ten years invested in her, and that if she could not learn classroom management techniques he would find her a different job in the district.  The Superintendent also stated that, if he learned from parents that Ms. Richard had disclosed confidential information about other students, he would have a "much more intense

12

conversation with [her]." When Ms. Richard offered to provide emails and documents to contradict the false accusations, Mr. Davis refused to review this evidence.

48.    Ms. Richard had never before heard any accusation that parents had complained about her. To the contrary, the only information she had heard from parents either directly or through the school administration was their enthusiasm and support of her excellence in teaching.

49.    Even though Ms. Bertinet and Ms. Roberts were well aware of the behavioral issues with Student 2 and Student 3, either through direct observations, meetings with students, or Ms. Richard's reports, Ms. Roberts accused Ms. Richard of trying to "frame" these students. They told Ms. Richard that another educational technician, Stacey Jette, would be placed in Ms. Richard's classroom to be "their eyes and ears" because they were worried that Ms. Richard was targeting the two students.

50.    Later that day, Ms. Bertinet handed Ms. Richard a memorandum that was placed in her personnel file. It stated: "Recently, concerns have been brought to her attention around classroom management and how it is impacting student safety; these concerns stem in part from an inconsistent follow-through on implementing the behavior plan that was developed by the Behavior Coach, as well as strategies presented to you by the Assistant Principal." Neither the memorandum, nor any administrator, explained to Ms. Richard what part of a behavior plan she allegedly had not implemented or which strategies she allegedly was not following. The memorandum was unsupported by any documentation and did not reflect reality. Ms. Richard emailed Ms. Bertinet to ask for clarification so that

13

Ms. Richard could better herself professionally in light of the accusations, but she never received a response.

51.     Throughout December and January, Ms. Bertinet wrote approximately six different memoranda to Ms. Richard outlining specific tasks Ms. Richard had to perform to "address these concerns." Although Ms. Bertinet was the author of the memoranda, she acknowledged later that Superintendent Davis was the driving force behind them.  Ms. Richard's compliance with these memoranda items was to be reviewed at a follow-up meeting on January 14, 2015. Per the terms of the memoranda, Ms. Richard had to implement the behavior plan, follow the behavior management recommendations of Ms. Roberts and the behavior coach, and keep Ms. Bertinet "abreast of all parent communication from now on, including email, phone, and parent conferences/meetings."

52.     Even though Ms. Bertinet had stated at the December 8th meeting that the purpose of the additional educational technician in her class was to serve as the administration's "eyes and ears," the memorandum said that the administration "will make every effort to provide educational technician support while data is being collected" to help Ms. Richard "adjust [her] current practices, for the next 3-4 weeks."

53.     The additional educational technician support that Ms. Bertinet offered lasted less than a month. The educational technician that was placed in her room to be the administration's "eyes and ears" soon replaced the original educational technician, who had served the three students with IEPs. As a result, these three special education students stopped receiving some of the accommodations required by their IEPs. Ms. Richard brought this to the attention of Ms. Bertinet on multiple occasions in emails and meetings.

14

54.     On December 17, 2014, Ms. Richard filed a union grievance because she had not been properly notified about the complaint regarding her classroom management before the investigatory meeting on December 8, 2014. The teachers' Collective Bargaining Agreement states that no teacher shall be reprimanded without just cause and requires that "any employee under investigation shall be informed of the nature of the complaint in writing at least 24 hours before any interview with the employee about the subject of the investigation." The obvious purpose of this provision is to allow employees to prepare to defend themselves against allegations of wrongdoing. In his email requesting the meeting, Mr. Davis had not even indicated that the concerns he wished to discuss were related to Ms. Richard's classroom management.  In addition, he had not provided the substance of any alleged concerns so that Ms. Richard could properly address them. Ms. Bertinet denied Ms. Richard's grievance on January 5, 2015. An Arbitrator later ruled in favor of Ms. Richard on this grievance.

55.     On January 12, 2015, Principal Bertinet scheduled a meeting with Ms. Richard and Assistant Principal Roberts on January 14 to discuss Ms. Richard's compliance with various memoranda explaining how Ms. Richard might adjust her teaching "practice." Ms. Richard had received no such memoranda concerning an alleged need to adjust her practices prior to her advocating for Student 2 and Student 3 to receive IEP referrals. In preparation for this meeting, Principal Bertinet requested that Ms. Richard provide a written response to certain questions regarding Ms. Richard's progress with the respect to these "adjustments."

56.     Ms. Richard attended the meeting on January 14, 2015. Clinton Nash and Robert Olson from the teachers' union accompanied Ms. Richard to the meeting. Ms.

Roberts, Ms. Bertinet, and Superintendent Davis were in attendance. At the meeting, Ms. Richard volunteered three separate times to share the written responses she had prepared regarding her progress per Ms. Bertinet's instructions.  Superintendent Davis, however, refused to accept her responses and said, "Do you know what the word deescalate means?" He instructed Ms. Richard that if she wanted to go over her written responses, she would need to set up a separate meeting with Ms. Bertinet.

57.    The next day, Thursday, January 15, 2015, Ms. Richard met with Ms. Roberts regarding an unrelated matter. Mr. Roberts did not ask Ms. Richard for her written responses. Similarly, when Ms. Richard saw Ms. Bertinet on Friday morning, January 16, 2015, Ms. Bertinet did not mention wanting the written responses.

58.    On Friday afternoon, however, Ms. Richard received an email from Ms. Bertinet, sent after they had briefly met in person and after Ms. Richard's lunch period. Because lunch is Ms. Richard's only break opportunity—which Ms. Bertinet knows—Ms. Richard had not seen the email until the end of the day. This email instructed Ms. Richard to provide her written responses no later than 3 pm that day. The written responses, however, were saved on Ms. Richard's iPad at home, so she could not send them while still at school. As Ms. Bertinet was at a training, Ms. Richard could not explain any of the timing to her. Ms. Richard called the union president and the District 3 UniServ Director to seek their advice regarding the request. They both recommended that Ms. Richard have an in-person conversation with Ms. Bertinet on Tuesday (Monday was a holiday) to go over her responses, instead of simply emailing them to her.

59.     On Sunday, January 18, 2015, Ms. Bertinet emailed Ms. Richard again and said that they needed to meet. Ms. Richard replied that same day that she was available to meet either Wednesday, January 21 or Thursday, January 22, 2015. The following Tuesday, January 20, 2015, Ms. Richard went to Ms. Bertinet's office three times seeking to provide her with her written responses.  On each occasion, Ms. Bertinet was either not in her office or the door was closed.

60.     Later that day, Ms. Bertinet and Mr. Roberts came to see Ms. Richard. Ms. Richard offered up her written responses. Ms. Bertinet refused to accept them and stated, "It's too late." She handed Ms. Richard a memorandum entitled "Failure to Perform," which was placed in Ms. Richard's personnel file. This memorandum reprimanded Ms. Richard for "fail[ing] to follow-through on multiple requests to respond in writing to our questions posed to you on January 12, 2015." Ms. Richard filed a second union grievance to contest this discipline.

61.     The Waterboro administration focused on compliance with its trumped-up framework of how to proceed "in almost all aspects of being an educator," rather than addressing the behavioral issues of the two students that continued to bully others in Ms. Richard's classroom.

62.     In early February 2015, Student 4's parents emailed Ms. Bertinet because the school's administration had not been communicating with them about Student 4's "on-going" issue with another student.  They believed that Student 4 was being sent to the office "for every little issue." They expressed their belief that Student 4 "was being 'targeted'

because [his parents] [were] questioning the administrators about your school vision, which is making sure students are in a safe learning environment."

63.     Ms. Bertinet attempted to shift the blame of the administration's failures onto Ms. Richard by responding to Student 4's parents that Ms. Bertinet would "touch base with [Ms. Richard] to discuss a communication plan." The parents responded as follows:  "The miscommunication happening is from administration not the teacher. I do not know why you are bringing Mrs. Richard into this. She is doing a great job and I feel like she is the only positive thing in my son's life while at WES."

64.     In March 2015, Student 4's parents again contacted the school because their son continued to come home with injuries inflicted by Student 2 and Student 3. By then, Student 4 had been kicked in the private parts, punched in the face, and had his hand stepped on and burned. Ms. Bertinet asked that Ms. Richard draft an "email to this family outlining behavior updates and positive interactions with peers, as it was felt there might be a misunderstanding on their part." Ms. Richard told Ms. Bertinet and Ms. Roberts that she was not comfortable writing such an email because Ms. Richard did not believe there was any "misunderstanding" on the part of these parents. Ms. Bertinet then offered to draft the letter and said that Ms. Richard could just sign it. Ms. Richard stated that she would need to read the letter before agreeing to sign it.

65.     On April 3, 2015, Student 4's parents came to the school to meet with Principal Bertinet, Assistant Principal Roberts, and Ms. Richard. The parents read the definition of "bullying" and asked Ms. Richard if their child was being bullied. Ms. Richard replied that in "my opinion, it seems to come in waves, where I feel like [Student 4] is one of

the children that are targeted by a peer or peers in her classroom." When the parents

demanded to know why Ms. Bertinet had promised them that no bullying was occurring, Ms.

Bertinet claimed, "This is the first time that Mrs. Richard has said that she felt he was being

targeted."

66.     Ms. Richard was stunned because Ms. Richard had reported to Principal

Bertinet on several occasions that Student 4 was being bullied, including during a meeting

with her just the day before. Ms. Richard looked at Ms. Bertinet and stated, "I have told you

that I felt several students in my room were being targeted. That is in the minutes from

yesterday, so that it is not one person's word against another." Ms. Bertinet then abruptly

ended the meeting.

67.     The following Monday, April 6, 2015, Ms. Richard had a meeting for her

second grievance. The administration offered to remove the second memorandum

reprimanding her for her supposed insubordination if she followed certain subjective criteria

until the fall of 2015. Ms. Richard felt that this was an attempt to set her up for further

sanctions, because the corrective action plan had no objective benchmarks and was based on

a false premise. Ms. Richard voiced apprehension about the offer.  At that point, Ms.

Bertinet handed her three envelopes.

68.     The first envelope contained a "Corrective Action Plan," which required Ms.

Richard to: (1) provide the administration weekly lesson plans, (2) "maintain a safe,

structured classroom environment that is conducive to learning [and] implement strategies as

presented to [Ms. Richard] by administration and the behavior coach . . . ," and (3)

"contribute to building a positive, professional climate both through words and actions."

69.     The second envelope contained another memorandum for Ms. Richard's personnel file, this time reprimanding Ms. Richard for leaving a level one educational technician alone with the students in her classroom on two separate occasions. Both of her absences from the classroom had been brief and justified.  The first time, Ms. Richard had gone to the bathroom and informed the education technician where she was going. The following day, Ms. Richard had to take a special education student to the office after he hit five students on the playground. Furthermore, level one educational technicians frequently serve as substitute teachers and are often in a classroom on their own. In fact, for at least six prior meetings into which the administration called Ms. Richard unexpectedly, Principal Bertinet had instructed Ms. Richard to go to the office and leave her students alone with the very same level one educational technician.

70.     The third envelope contained a letter from Mr. Davis scheduling a meeting for April 8, 2015, to discuss: "1. [Ms. Richard's] absence from [her] classroom duties during instruction hours; 2. Identification of student conduct to include: a. Bullying, b. Targeting, c. Toileting; 3. Failure to follow administrative directives." The letter warned that the meeting could result in "disciplinary action."

71.     The District's actions had placed Ms. Richard under immense stress over several months. M. Richard began vomiting blood due to the stress the District placed her under. By then, Ms. Richard had lost 20 pounds due to the stress.

72.     As a result of the emotional distress Ms. Richard was experiencing due to the District's retaliatory actions, her doctor urged her to take a medical leave beginning on April

7, 2015. Ms. Richard notified the school that she was taking this medical leave and that she planned to return to work on May 1, 2015.

73.     Barely a week after her second grievance meeting with the administration, and her physician urging her to take a medical leave beginning on April 7, 2015, Ms. Richard received a letter, dated April 15, 2015, from the special education director, Susan Prince. This letter reprimanded Ms. Richard for allegedly failing to report a student's toileting issues to his parents, the school nurse, and the administration. The toileting concerns had been raised at a meeting with the student's parents on March 17, 2015, nearly a month prior. On March 19, 2015, Ms. Richard had emailed Ms. Prince, Ms. Bertinet, Ms. Roberts, and the school nurse to explain that Ms. Richard had not observed any toileting issues with this student, apart from an isolated incident in the fall, which Ms. Richard had promptly reported to the school nurse. Ms. Richard had explained that it was her practice to regularly encourage all her learners to use the bathroom at least four times daily. Ms. Richard also had noted that this student attended the YMCA after-school program, so that Ms. Richard was not with the child immediately before he was sent home each day.

74.     Since that communication in March, Ms. Richard had not received any further communications from Ms. Prince on this student's alleged toileting issues until she received that letter dated April 15, 2015, almost a month later, rehashing many of the concerns Ms. Richard had already addressed. The fact that Ms. Richard received this letter only nine days after her second grievance meeting with administration, when the matter had been addressed a month before, indicates it was retaliatory in substance and intent.

21

75.     Even though Ms. Richard had notified the school that she planned to return from her medical leave on May 1, 2015, Waterboro sent a letter home with Ms. Richard's students on April 16, 2015 notifying their parents that a permanent substitute had been hired for her classroom for the remainder of the school year. The letter stated that Ms. Richard was out on a leave of absence for the remainder of the year, even though that was not accurate. Ms. Richard did not receive a letter from Superintendent Davis until April 22, 2015. This letter was dated April 15, 2015, but not sent until April 16, 2015 and, strangely, mailed to an incorrect address so that it was not received by Ms. Richard until well after the administration had notified all the parents and staff that she would be replaced by a permanent substitute teacher. This letter informed Ms. Richard that she had been transferred to the Lyman Elementary School for the remainder of the school year to serve as a teacher's aide. Previously, on April 7, 2015, Superintendent Davis had urged an MEA representative to encourage Ms. Richard to stay out of school for the remainder of the school year, despite her doctor's medical recommendation that she would be able to return to her classroom on May 1, 2015.

76.     Ms. Richard later received a letter from Mr. Davis dated May 3, 2015, which notified her that she had been transferred to teach second grade at Waterboro Elementary for the 2015-2016 school year, even though there were openings at Waterboro to teach kindergarten that year. Then, on June 10, 2015, Mr. Davis changed Ms. Richard's work assignment for 2015-2016 a third time, assigning her to teach fourth grade at Waterboro.

77.     The District also refused to pay Ms. Richard's salary using the sick leave bank of which she is a member. Ms. Richard followed the Collective Bargaining Agreement

guidelines to withdraw days from the sick leave bank. Despite her compliance with all procedures, Superintendent Davis has refused to grant her pay from the sick leave bank, falsely claiming on two occasions that the District had not received a statement from her medical provider. His assertions are directly contradicted by his email of May 21, 2015 to District 3 UniServ Director, Robert Olson, in which he confirmed, "We have received the revised and updated statement from the medical provider."

78.    Upon information and belief, Mr. Davis stated to MEA Representative, Clinton Nash, on or about May 2015, "What else do I have to do to make [Ms. Richard] resign?"

79.    Due to her continued emotional distress, Ms. Richard was not able to return to work until January 2016.

80.    Ms. Richard was informed on December 10 during an arbitration of one of her grievances that the District was transferring her to Shapleigh Memorial School to teach first grade. She and another, new, teacher were assigned to Shapleigh after the previous teacher retired suddenly; they were assigned half of the students each from the prior large class.

81.    The other teacher was assigned to take over the first grade classroom where the current class was taught, which included all the supplies and work from the recently departed teacher. In contrast, Ms. Richard had only five days to set up an entire other classroom. It took her three full days, working 10-12 hours each day, to set up the space. This classroom contained no materials except old crates, old colored pencils and crayons. Unlike the other teacher, Ms. Richard did not receive a school computer until February

2016, yet was required to complete unit plans, attendance and input grades electronically and online without one.

82.     Upon Ms. Richard's request to work with the prior teacher whose class she would be taking over, the District permitted Ms. Richard only to "shadow" the prior teacher, without pay, during the last few days in December.  In contrast, the other teacher was allowed to work three days, from January 4, 2016 – January 7, 2016, with the prior teacher. Ms. Richard received no time during the school day to speak with the prior teacher.

83.     Ms. Richard began teaching her students on January 4, 2016. After school, Assistant Superintendent Larry Malone held a two-hour meeting with Shapleigh Memorial Principal Timothy Stinson and Shapleigh Memorial Vice Principal Marisa Penney, and Ms. Richard's former Vice Principal Ms. Roberts. Ms. Roberts had been asked to attend in order to explain and elaborate on Ms. Richard's Corrective Action Plan. Ms. Roberts, however, hardly spoke at the meeting. Ms. Richard attended along with Deborah Wintle, the Maine Education Association Building Representative for Shapleigh Memorial School. At that meeting, the District informed Ms. Richard that the Corrective Action Plan that she was currently following would be changed.

84.     On January 11, 2016, Ms. Richard attended a Corrective Action Plan Meeting with Mr. Stinson and Ms. Penney. On January 15, 2016, Mr. Stinson did a walk-through—an unannounced visit and observation of the classroom—of Ms. Richard's classroom.

85.     On January 27, 2016, Ms. Richard received her 2014-2015 Summative Evaluation from Christine Bertinet. Ms. Richard was provided a response deadline of eight days after the date of the Summative Evaluation. Although interdepartmental mail normally

24

takes only one day for messages to be sent or received, the letter was dated January 20, 2016, giving Ms. Richard only one day to prepare her response.

86.     Ms. Richard had a doctor's medical note prohibiting her from entering Waterboro Elementary School until she was reevaluated in May 2016. Nonetheless, the District provided no accommodations for Ms. Richard to participate in a mandatory training session that was scheduled at that school until twenty minutes before it began.

87.     Ms. Richard was forced to endure scrutiny by District administrators that was not required of any other teachers, including the other first grade teacher. For example, Ms. Richard was subject to several "walk throughs" by the administrators. Unlike the other first grade teacher, Ms. Richard received no prior notice of the administrator's walk-throughs. In addition, while most other teachers in the District have at most two walk-throughs per school year. Ms. Richard has been subjected to 8 or 9 unannounced walk-throughs since returning to teach in January 2016.

88.     On February 25, 206, the District gave Ms. Richard an "intensive Support Professional Improvement Action Plan." This plan was significantly different and much more lengthy and time-consuming than the original "Corrective Action Plan" initiated on April 6, 2015. Moreover, Ms. Richard was required to implement certain requirements in the plan on which she had yet to be trained. Complying with the "Action Plan" required Ms. Richard to spend an average of 20 extra hours each week of uncompensated work to remain in compliance. In addition, Ms. Richard was required to have several meetings with administrators to discuss implementation of the Corrective Action Plan.

89.     On March 24, 2016, Assistant Superintendent Malone conducted an "investigation" into Ms. Richard's alleged violations of school policy in 2015, in the wake of her advocacy for Student 2 and Student 3 and her grievance filings. At that time, Superintendent Davis told the President of the MEA, Clinton Nash, that if Ms. Richard filed a grievance as to his threat of investigation, he would personally investigate her and "find something." As part of this 2016 "investigation" process, Assistant Superintendent Malone repeatedly sent emails containing inaccurate information that erroneously accused Ms. Richard of wrongdoing, including stealing students files, failing to follow a mandate to copy administration, and not making the nurse aware of toileting issues with students.

## COUNT I
### (Retaliation under Title II of the Americans with Disabilities Act, 42  U.S.C. § 12101, *et seq.*; 34 C.F.R. §1007(e))

90.     Plaintiff repeats the allegations contained in paragraphs 1 through 89.

91.     Plaintiff is a person who made a complaint, assisted or protected a person with a disability within the meaning of Americans with Disabilities Act ("ADA") in her advocacy for the children in her classroom on issues related to their federal and state education rights.

92.     RSU 57 was aware of Plaintiff's advocacy.

93.     RSU 57 discriminated and retaliated against Ms. Richard in response to her protected activity by engaging in a series of adverse actions.

94.     By virtue of the foregoing, RSU 57 has violated Ms. Richard's right to be free from retaliation, intimidation, coercion, and intimidation related to her opposition of acts or

26

practices unlawful under the ADA. Its basis for disciplinary actions against plaintiff—alleged teacher misconduct or poor performance—was untrue and pretextual.

95.     RSU 57's actions have caused Ms. Richard harm, including damage to her reputation and emotional distress.

## COUNT II
### (Retaliation under Section 504 of the Rehabilitation Act,
### 29  U.S.C. § 79; 34 C.F.R. §1007(e))

96.     Plaintiff repeats the allegations contained in paragraphs 1 through 95.

97.     Plaintiff is a person who made a complaint, assisted or protected a person with a disability within the meaning of Section 504 of the Rehabilitation Act ("Section 504") in her advocacy for the children in her classroom on issues related to their federal and state education rights.

98.     Plaintiff repeats the allegations contained in paragraphs 1 through 93.

99.     Plaintiff is a person who made a complaint, assisted or protected a person with a disability within the meaning of Section 504 of the Rehabilitation Act ("Section 504") in her advocacy for the children in her classroom on issues related to their federal and state education rights.

100.    RSU 57 was aware of Plaintiff's advocacy.

101.    RSU 57 discriminated and retaliated against Ms. Richard in response to her protected activity by engaging in a series of adverse actions.

102.    By virtue of the foregoing, RSU 57 has violated Ms. Richard's right to be free from retaliation, intimidation, coercion, and intimidation related to her opposition of acts or

27

practices unlawful under the ADA. Its basis for disciplinary actions against plaintiff—alleged teacher misconduct or poor performance—was untrue and pretextual.

103.     RSU 57's actions have caused Ms. Richard harm, including damage to her reputation and emotional distress.


## COUNT III
### (Retaliation under the Maine Human Rights Act, 5 M.R.S.A. § 4633)

104.     Ms. Richard repeats the allegations contained in paragraphs 1 through 103.

105.     Ms. Richard made good faith reports to RSU 57 of actions that she reasonably believed to be violations of the Maine Human Rights Act, which constituted protected activity under that law.

106.     RSU 57 discriminated and retaliated against Ms. Richard in response to her reporting activity by engaging in a series of adverse actions.

107.     By virtue of the foregoing, RSU 57 has violated Ms. Richard's right to be free from retaliation, interference, coercion, and intimidation related to her opposition of acts or practices unlawful under the Maine Human Rights Act.

108.     RSU 57's actions have caused Ms. Richard harm, including damage to her reputation and emotional distress.


## COUNT IV
### (Violation of Whistleblower's Protection Act)

109.     Plaintiff realleges and herby incorporates the paragraphs 1 through 108.

110.     Ms. Richard reported to RSU 57 what she had reasonable cause to believe was a violation of state or federal law. 26 M.R.S. § 833(1)(A).

111.    RSU 57 discriminated and retaliated against Ms. Richard in response to her reporting activity by engaging in a series of adverse actions.

112.    By virtue of the foregoing, RSU 57 has violated Ms. Richard's right to be free from retaliation, interference, coercion, and intimidation in response to her reporting what she reasonably believed to be a violation of state law.

113.    RSU 57's actions have caused Ms. Richard harm, including damage to her reputation and emotional distress

WHEREFORE, Ms. Richard respectfully requests that the Court award her:

    a.  Compensatory damages in an amount that is reasonable in the premises;

    b.  Civil penal damages in an amount appropriate under the circumstances;

    c.  Her reasonable costs and attorney's fees; and

    d.  Such other relief as the court may deem just and proper.

Dated:  May 27, 2016

/s/ Stacey D. Neumann
Stacey D. Neumann, Esq.
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651
E-mail:  sneumann@mpmlaw.com