## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| CHARLENE RICHARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:16-cv-00265-JAW |
| | ) | |
| REGIONAL SCHOOL UNIT 57, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Finding that a teacher at a school district made out a prima facie case of retaliation against the school district for her advocacy on behalf of disabled students, that the district sustained its burden of production to demonstrate a legitimate, nondiscriminatory reason for its adverse actions, and that the teacher proved that the district's proffered reason was pretextual, the Court rules in favor of the district in this retaliation claim because it concludes that the teacher failed to demonstrate that the true reason for the district's adverse actions was related to her advocacy.

## I.     PROCEDURAL BACKGROUND

On May 27, 2016, Charlene Richard, a teacher at Regional School District Unit 57 (RSU 57), filed suit against RSU 57 claiming that RSU 57 retaliated against her in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq.*, section 504 of the Rehabilitation Act (Rehabilitation Act), 29 U.S.C. § 79, section 4633 of the Maine Human Rights Act (MHRA), 5 M.R.S. § 4633, and that it violated the Maine Whistleblower's Protection Act (MWPA).  26 M.R.S. § 833(1)(A).

*Compl.* (ECF No. 1). RSU 57 answered the Complaint on August 1, 2016, denying its essential allegations and raising nine affirmative defenses. *Answer of Def. Regional Sch. Unit 57* (ECF No. 5). The original discovery period ended on December 20, 2016, *Scheduling Order* (ECF No. 7); it was extended once by agreement of the parties to January 20, 2017. *Pl.'s Unopposed Mot. to Extend Disc. Deadline* (ECF No. 10); *Order* (ECF No. 13). The Court held a final pretrial conference on April 10, 2017. *Report of Final Pretrial Conf. and Order* (ECF No. 26).

The Court held a five-day bench trial from May 22, 2017 through May 26, 2017. *Min. Entries* (ECF No. 33-38). Ms. Richard and RSU 57 filed simultaneous post-trial briefs and proposed findings of fact on June 9, 2017. *Pl.'s Post-Tr. Br.* (ECF No. 45); *Post Tr. Br. of Def. Regional Sch. Unit 57* (ECF No. 43); *Def.'s Proposed Findings of Fact and Conclusions of Law* (ECF No. 44) (DPFOF). The parties simultaneously filed responsive briefs on June 16, 2017. *Pl.'s Post-Tr. Reply Br.* (ECF No. 48); *Post Tr. Reply Br. of Def. Regional Sch. Unit 57* (ECF No. 47) (*RSU 57 Post Tr. Reply*).

## II.   SUMMARY OF LEGAL STANDARDS

Ms. Richard has brought claims under four different statutes; however, for each statute, the courts typically employ the same burden-shifting analysis set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Delgado Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 133-34 (1st Cir. 2017); *Kelley v. Corr. Med. Servs.*, No. 11-2246, 2013 U.S. App. LEXIS 2588, at *16 (1st Cir. Feb. 6, 2013) ("A retaliation claim under the ADA is analyzed under the familiar burden-shifting framework drawn from cases arising under Title VII");

*Pippin v. Blvd. Motel Corp.*, 835 F.3d 180, 183 (1st Cir. 2016) (quoting *Walsh v. Town of Millinocket*, 2011 ME 99, 28 A.3d 60, 616)) (MWPA).[1]

There is some question as to whether the *McDonnell Douglas* burden-shifting analysis is applicable at trial as opposed to summary judgment. *Palmquist v. Shinseki*, 689 F.3d 66, 71 (1st Cir. 2012) (At trial, "the *McDonnell Douglas* framework, with its intricate web of presumptions and burdens, becomes an anachronism. The jury, unaided by any presumptions, must simply answer the question of whether the employee has carried the ultimate burden of proving retaliation") (internal citations omitted); *Brady v. Cumberland Cnty.*, 2015 ME 143, 126 A.3d 1145 ("Because this case reaches us on summary judgment, it does not present us with occasion to consider whether the *McDonnell Douglas* burden-shifting structure should still be treated as a useful analytic device at trial"). Even so, as the case has been tried before the Court and as the parties analyzed the case under the *McDonnell Douglas* burden-shifting framework, the Court applied that analysis to this case.

Under the *McDonnell Douglas* analysis, Ms. Richard bears the initial burden of establishing a prima facie case of retaliation. To do so, she must prove that "(1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action." *D.B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012). If Ms. Richard makes out a

---

[1]     In *Brady v. Cumberland County*, 2015 ME 143, 126 A.3d 1145, the Maine Supreme Judicial Court ruled that the *McDonnell Douglas* burden-shifting analysis is not applicable to motions for summary judgment under the MWPA. *Id.* ¶ 39 ("[W]e hold that at the summary judgment stage in WPA retaliation cases, the parties are held to the same standard as in all other cases").

prima facie case, the burden shifts to RSU 57 to articulate a legitimate, nondiscriminatory reason for doing what it did. *Delgado Echevarria*, 856 F.3d at 134. If RSU 57 meets its burden of production, the burden shifts back to Ms. Richard "to show that the [articulated] reason was mere pretext." *Id.* (quoting *Collazo-Rosado v. Univ. of P.R.*, 765 F.3d 86, 92 (1st Cir. 2014) (insertion in original)). Ms. Richard bears "the ultimate burden to create a plausible inference that the employer had a retaliatory motive." *Id.* (quoting *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 36 (1st Cir. 2010)).[2]

## III.   THE HEART OF THE CASE: THE DECEMBER 8, 2014 MEETING

The heart of this case concerns a December 8, 2014 meeting among Ms. Richard, RSU 57 Superintendent John Davis, Waterboro Elementary School (WES) Principal Christine Bertinet, Assistant Principal Melissa Roberts, and Clinton Nash, the local president of the Maine Educational Association, the teachers' union. During that year, Ms. Richard had been teaching a kindergarten class at WES and on Friday, December 5, 2014, Superintendent Davis called the meeting to discuss "concerns about [Ms. Richard's] classroom and the conduct of the 5 year olds in the room." *Trial Ex.* 36 at 1.

Although there are different perspectives about the meeting, the consensus was that Superintendent Davis became extremely angry with and accusatory of Ms.

---

[2]      In *Palmquist*, the First Circuit concluded that in a mixed motive case, a plaintiff proceeding with a Rehabilitation Act retaliation claim must prove that the retaliation was the "but-for cause" of the adverse employment case. 689 F.3d at 68. Here, the Court concludes that Ms. Richard has not proven that RSU 57 retaliated against her because of her advocacy for the disabled students. Having failed to prove that RSU 57 was motivated at all by unlawful retaliation, she also failed to prove the higher "but for" standard in a mixed motive case under *Palmquist*.

Richard. In Ms. Richard's words, Superintendent Davis was "serious, scary and angry." Mr. Nash described the meeting as "tense" and "fraught." He said that he became nervous at the meeting, even though he was not the subject of Superintendent Davis' attention. After the meeting, Ms. Richard testified that Principal Bertinet apologized for the way the meeting had gone, saying that she had never seen Superintendent Davis act that way. Ms. Richard said that Vice-Principal Roberts facetiously told Ms. Richard: "I almost peed my pants."

Specifically, Ms. Richard recalled that Superintendent Davis called her "pathetic", suggested that she had breached student confidentiality, told her that parents had been complaining about her for years, and that she, not the boys, was the problem. Ms. Richard asked Superintendent Davis to identify the parents who had complained about her, and Superintendent Davis did not respond. Ms. Richard said Superintendent Davis ended the meeting by telling her to "get back to class and teach."

The events that led to Ms. Richard's lawsuit flowed directly from the December 8, 2014 meeting. Following Superintendent Davis' berating of Ms. Richard, the RSU 57 administration focused intensely on Ms. Richard's performance as a teacher, ultimately transferring her from teaching kindergarten at WES to teaching first grade at Shapleigh Elementary School (SES) under an extremely constraining and strictly-enforced Corrective Action Plan. Ms. Richard buckled under intense administrative pressure, lost time, required counseling, and filed this lawsuit.

The nub of the question before the Court is what made Superintendent Davis so very irate with Ms. Richard at the December 8, 2014 meeting. Ms. Richard claims that it was the fact that she advocated for two students in her classroom, T.K. and L.P., who had suspected disabilities, as well as for other students in her classroom. RSU 57 contends that Superintendent Davis became justifiably irritated with Ms. Richard because she not only failed to appropriately manage her classroom, including these two students, but also attempted to shift the blame for her own teaching inadequacies to the administration for failing to supply adequate personnel for the classroom and that she blamed the boys themselves.

In this opinion, the Court sets out in detail its findings of fact that illuminate this critical issue. Following the December 8, 2014 meeting, the Court finds that Ms. Richard was a marked teacher. Taking the strong cue from Superintendent Davis, WES administration, specifically Principal Bertinet and Vice Principal Roberts, began micromanaging Ms. Richard's classroom, criticizing her asserted failures, and building a case for administrative sanction by reprimands.

Ms. Richard buckled under the intense pressure from WES administration and by early April, 2014, Ms. Richard lost considerable weight, vomited blood, and was required to take a leave of absence from teaching. The stress from the administration was so severe that in April 2015, Ms. Richard's physician, Dr. Christy Pulsifer, thought Ms. Richard was suffering from severe depression, and Ms. Richard was taken out of work on a medical basis at that time. In Dr. Pulsifer's words, Ms. Richard was "pretty much falling apart."

In response to Ms. Richard's difficulties, Superintendent Davis wrote her a letter dated April 15, 2015, informing her that when she returned to work, she would be reassigned to a different school, the Lyman School, and she would be working "in the kindergarten classroom supporting the current teacher." *Id.* 83. Ms. Richard was devastated by this letter. She thought she was being demoted to an education technician and reassigned as a punishment. In late April, 2015, Dr. Pulsifer diagnosed post-traumatic stress disorder caused by a stressful workplace.

Ms. Richard was able to return to work on January 4, 2016, and Ms. Richard agreed to teach first grade at Shapleigh Elementary School. Since her return to work, she has operated under a Personal Improvement Plan (PIP). *Id.* 112. The PIP is very detailed, running seven pages, and covers all aspects of her classroom performance. *Id.* Ms. Richard estimated that it takes twenty hours per week just to comply with the directives of the PIP.

## IV.    FINDINGS OF FACT

### A.    Charlene Richard: 2005 through June 2014

From the outset of her career in 2005 through June 2014, Ms. Richard was an exemplary, highly professional kindergarten teacher with uniformly excellent reviews. Ms. Richard holds a bachelor's degree from the University of New Hampshire and received a master's degree in education in 2005 from the University of New England. Ms. Richard was employed at a private kindergarten in 2002-2003, and she student-taught at WES in 2004. In 2005, RSU 57 hired her to teach as a long-term substitute, and in July 2006, as a full-time teacher.

During her two-year probationary period, Ms. Richard received excellent performance evaluations. Notably, on December 12, 2007, Richard Knox, the evaluator, praised her handling of an unruly student:

> When one of the students attempted to stir up others by cutting in line, bossing others, and throwing a carpet square, your measured, but firm response was exactly what the situation called for. Well done.

*Id.* 1 at 9. On April 15, 2008, Mr. Knox wrote that "[c]lassroom management and embedding routines are strengths of Charlene's practice." *Id.* 2. He concluded:

> Based on the continued superior classroom practice that Mrs. Richard demonstrates, I strongly recommend that she be placed on continuing contract for MSAD#57.

*Id.* RSU 57 awarded Ms. Richard a continuing contract beginning in the 2008-09 school year.

From 2006, Ms. Richard worked at WES until January 2016 when RSU 57 transferred her to the SES. Except for the year 2010, when she taught third grade, Ms. Richard was a kindergarten teacher throughout her time at WES. At SES, RSU 57 assigned her to teach first grade.

Before 2015, Ms. Richard had never been reprimanded by RSU 57 and she never received a complaint from parents, the school, or her colleagues. To the contrary, Ms. Richard received uniformly excellent assessments. *Id.* 3-12. For example, Christine Bertinet, then assistant principal at WES, issued three reports of her classroom observations of Ms. Richard from December 19, 2013 through June 18, 2014. *Id.* 1, 9, 10. On December 19, 2013, Ms. Bertinet praised Ms. Richard, stating:

> It is always a pleasure to spend time in your room. Your classroom is so well organized and arranged in such a way that maximizes both collaborative and independent learning opportunities.

*Id.* 9 at 1.  She further wrote:

> I love the presence of all four lesson components: direct, guided, collaborative, independent.  This was an excellent lesson with high levels of engagement.

*Id.* at 2.

> On February 26, 2014, Ms. Bertinet wrote:

> Your lesson plans are very thorough, well organized, and interdisciplinary in design.  I would like to use this plan as a model with your permission.

*Id.* 12 at 1.

> On June 18, 2014, Ms. Bertinet stated:

> The student responses to questions did NOT save and I apologize that you're unable to view their wonderful words.  It was a pleasure working with you this year.

*Id.* 3 at 1.  Ms. Bertinet's June 18, 2014 evaluation was uniformly positive, including her assessment of Ms. Richard's class control.  *Id.* at 1-10.

### B.    RSU 57 and Special Education: An Overview

RSU 57 is a regional school district that serves the towns of Alfred, Limerick, Lyman, Newfield, Shapleigh and Waterboro, Maine.  RSU operates five elementary schools, one middle school, and a high school with approximately 3,000 total students.  WES is the largest elementary school in RSU 57.  RSU 57 has a Behavior Program with a mission to provide special education services to elementary school students with disabilities that manifest through behavior problems.  Beginning 2014-15, RSU 57 transferred the Behavior Program to WES and staffed it with a newly hired special education teacher, Nicole Winship, a behavior specialist.

Three general categories of students with special education requirements arrive at kindergarten: (1) those students previously identified as qualified for special education, (2) those students who are suspected as qualified for special education through testing, and (3) those students who are neither previously identified nor suspected as qualifying, but who are identified through the year, usually by teacher observation. Some students with special needs start kindergarten already identified as eligible to receive special education. Child Development Services has typically identified these students during preschool and the students start kindergarten with an Individualized Education Program [IEP]. The contents of the IEP define the components of the students' programming as they enter public school. One of the specialized services often given to students with disabilities is an Educational Technician, a paraprofessional certified by the Maine Department of Education to work with students with disabilities. Providing educational technicians to a child with a disability increases RSU 57's cost of educating the child. In addition, the IEP sometimes requires that RSU 57 provide outside services or even out-of-District placement of special needs children, either of which results in additional costs to RSU 57. Thus, students identified with disabilities can become significant expenses. *Tr. of Proceedings* 5:13-15 (ECF No. 46) (*Davis Tr.*) ("Q. And kids who are identified with disabilities can become significant expenses; can't they? A. They can"). If RSU 57 had not allocated enough money for special needs students, RSU 57 would have to reallocate money within its budget and occasionally faced a financial crunch. *Id.* 6:9-23.

A second category of students is those who arrive at kindergarten without an IEP, but are suspected of having a qualifying disability due to "red flags" either through pre-admission testing or teacher observation. Child Protective Services does not identify all special education students before kindergarten and their qualifying disability may become apparent only after they enter school. In June of the year the student is to enter kindergarten, RSU 57 performs a series of tests, called the Developmental Indicators for the Assessment of Learning (DIAL), which evaluates the child in a variety of domains, including fine and gross motor skills, speech-language skills, vision, hearing, and pre-academic skills. The DIAL results could generate "red flags" for the incoming student. In addition, the teacher may observe signs that suggest a particular student might qualify for special education services.

Finally, there is a group of students who have not been identified by Child Protective Services and have not been assessed by DIAL, but the teacher, through observations, suggests might qualify for special education services. *Id.* 2:19-22 ("[T]eachers were instrumental in identifying those [special needs students] during the school year").

RSU 57 Board Policy "seeks to ensure that all children within its jurisdiction are identified, located and evaluated who are school-age 5 through the school year they turn 20 and who are in need of special education and supportive assistance." *Trial Ex.* 113 at 1. RSU 57 Board Policy further provides that "[i]t shall be the policy of RSU #57 to refer all school-age students suspected of having a disability that requires special education to the IEP Team for an evaluation in all suspected areas

of disability. Referrals of students to the IEP Team may be made at any time by parents, professional school staff, and/or by other persons knowledgeable about the child's educational needs." *Id.* 115 at 1.

Consistent with RSU 57 Board Policy, it is RSU 57's philosophy to refer students for evaluation as soon as that need is identified. In fact, RSU 57 referred more than 120 students for special education services during the 2012-13 school year, over ninety students during 2013-14, and about eighty during 2014-15. During the period from 2011 through 2016, the largest percentage of referrals occurred during the kindergarten year when students are five and six years old.

While requiring that students suspected of needing special education services be referred for evaluation, RSU 57 encourages use of the "Response to Intervention" (RTI) process before referral where possible. The RTI process applies a tiered approach to addressing the needs of students who are not meeting grade level academic or behavioral standards by providing targeted support to the student in the least restrictive environment. *Id.* 20 at 7-8. Tier One Support is delivered and monitored by the classroom teacher and, under RSU 57 policy is supposed to last between four and six weeks; Tier Two Support is delivered by the classroom teacher, support staff, specialists and/or guidance and generally lasts eight to ten weeks; Tier Three Support is delivered by the classroom teacher, specialists, therapists, guidance, social workers, and/or support staff, and generally lasts twelve to sixteen weeks; and Tier Four Support is special education services usually in the form of an IEP. *Id.*

The RTI process seeks to avoid labeling the student as disabled because the label is difficult for parents and sometimes disadvantageous for the student. Therefore, if the interventions at any Tier are successful, the student may be removed from the RTI process. In addition, if a set of interventions at a specific Tier is not successful, the RTI team will try additional and different supports at the same Tier before moving to the next Tier. The time frames for each Tier are not rigid. Although under RSU 57 policy, a student does remain in Tier One longer than four to six weeks, Tiers Two and Three may take somewhat longer than the listed time periods if the student is making progress or if different supports are being implemented. Also, the RTI process may be visualized as a pyramid with Tier One at the broad bottom and Tier Three (before referral to Tier Four) at the narrow top. *Id.* at 7. As the student proceeds from Tier to Tier, the number of students at each Tier is reduced and the intensity of the intervention is increased. *Id.*

During this time, the RTI process at WES was divided into two parts. Academic issues were addressed by the RTI Team and behavioral issues were addressed by the Student Assessment Team (SAT). The SAT Team at WES consisted of Nicole Winship, the Behavioral Specialist, Vice Principal Roberts, and other WES staff members.

Although the RTI process is encouraged as a first step, students may bypass the process and go straight to a special education referral. Under Maine regulations, parents have the legal right to refer their child directly to an IEP Team for immediate eligibility evaluation and determination without using the RTI pre-referral process.

05-071 C.M.R. ch. 101, § IV.2.E(3) ("A parent may refer at any time"); *Davis Tr.* 3-6. RSU 57 encouraged teachers who thought a student might qualify for special education services to use the RTI process.[3]

### C.    Special Education Services and Charlene Richard

Ms. Richard usually had about two special education students in her kindergarten classroom. She and one other teacher were the ones commonly assigned the special education students. Once she was assigned a special education student, Ms. Richard reviewed their IEPs and contacted the student's parents. Usually, special education students required accommodations. For example, instead of being placed at a table of four students, they might be assigned a table of no more than two students. Ms. Richard's duty as a kindergarten teacher was to familiarize herself with the student's IEP and to make certain that the terms of the IEP were complied with.

Those kindergarten students not previously identified as special education eligible pose a unique timing issue. Children come to kindergarten at different levels of development and it takes all children time to settle into the routine of a classroom.

---

[3]      One lesson from this case is how regulated and bureaucratized public school teaching has become. For example, Susan Prince, the Special Education Director for RSU 57, testified that there is a difference between the IEP process and Section 504 students. The IEP process requires the development of specialized direct instruction (SDI), but Section 504 addresses those students who are disabled and require accommodation, but who are determined not to need SDI. RSU 57 also slices a distinction between academic and behavioral disabilities, treating the two differently.

The regulation of teaching is compounded by periodic changes in teaching philosophy. There are different models of teacher evaluation within the education field. The Charlotte Danielson model, for example, differs from the Robert Marzano model, and it appears that teachers are sometimes evaluated in part based on the philosophical preferences of the assessor.

No doubt regulation and changes in pedagogical philosophy are well intentioned. For the outsider, however, understanding the bureaucratic and theoretical apparatus surrounding public school education is a challenge.

Also, a kindergarten student may exhibit adverse behaviors that are unrelated to a disability and may be caused by poor role models at home, other environmental struggles, boredom, or attention seeking. Like all kindergarten teachers, Ms. Richard did not want a child mislabeled due to the child's initial adjustment difficulty. In short, simply because a kindergarten student is misbehaving does not mean that he or she is disabled.

Therefore, a teacher referral to the RTI process usually does not occur in the first few weeks of school. Typically, a kindergarten teacher would not make a referral until approximately mid-October. Once a RTI referral is made and the child is slotted into Tier One, the classroom teacher is primarily responsible for carrying out this phase. For example, Tier One often involves smaller group instruction. Even though Tier One is supposed to last four to six weeks and the total amount of time for Tiers One through Three is supposed to be about eight months, in practice, kindergarten students rarely go beyond Tier One, and at first grade, they start Tier One over again.

### D.     Charlene Richard, an Autistic Student, and K.M.

During the school year 2012-13, RSU 57 assigned a child to Ms. Richard's class. Ms. Richard raised concerns about this student and later the student was diagnosed with autism. The student was then removed from her class and assigned to a special program geared to autistic children.

In mid-March, 2014, RSU 57 assigned K.M., a new male student, to Ms. Richard's kindergarten classroom. K.M. transferred from the Reiche School in Portland, Maine. RSU 57 informed Ms. Richard of K.M.'s placement by email, stating

"Congratulations, new student!", but it did not forward his file to her. When informed about K.M.'s imminent arrival, Ms. Richard sought to review K.M.'s file and to familiarize herself with his needs; however, RSU 57 had received none of K.M.'s paperwork, making background preparation for his arrival impossible. Ms. Richard attempted to contact K.M.'s parents, but their phone number did not work. Upon arrival, K.M. engaged in troubling behaviors, including making no eye contact, making shooting motions with his fingers at other students, yelling and jumping, pounding on the table, directing comments like "Kill! Kill! Die!" at other students, and drawing pictures of people being decapitated and covered in blood.

Ms. Richard took it upon herself to contact his Reiche School teacher, Kevin Brewster. Mr. Brewster told Ms. Richard that when he was a student at the Reiche School, K.M. displayed odd behaviors. There were social concerns, such as obsessions with female peers, yelling outbursts with no apparent trigger, and academic issues. Mr. Brewster told Ms. Richard that K.M. was in RTI Tier Two and was being fast-tracked to Tier Three. *Trial Ex.* 13 at 1. On March 18, 2014, Ms. Richard emailed school officials about K.M. and what she had discovered by talking with Mr. Brewster. *Id.* Ms. Richard suggested a meeting to discuss the next steps and "seeing how we can help him." *Id.* at 1. Ms. Richard repeatedly asked the WES administrators to provide her with guidance and support for dealing with and responding to K.M.'s behaviors. She was not asking to have him removed from her classroom; she was asking that he receive services and accommodations that would allow him to succeed

in her classroom. Despite Ms. Richard's requests, WES administration only allowed Ms. Richard to "buzz" the principal's office whenever K.M. became violent.

On March 19, 2014, Ms. Bertinet visited Ms. Richard's classroom and compiled a set of observations about K.M. and Ms. Richard. *Id.* 15 at 1-2. Ms. Bertinet's observations do not contain any criticism of Mr. Richard; to the contrary, she praises Ms. Richard's "use of questioning", the "energy" in the room, which she characterizes as "wonderful," and her use of "proximity" with K.M. *Id.* Ms. Bertinet describes some of the unusual aspects of K.M.'s responses, including being in "an imaginary place," responding to questions with a "high pitched voice," and being unable to respond to questions. *Id.*

After about three weeks in Ms. Richard's class, RSU 57 transferred K.M. to another classroom. This was not done at Ms. Richard's request. Ms. Bertinet explained that the transfer was done because K.M. was not having a positive experience in Ms. Richard's classroom and it was not the right placement. The new classroom had two educational technicians. After the transfer, K.M. did better, although he continued to engage in some difficult behaviors. Also, K.M. was started in the RTI process. RSU 57 ended up referring K.M. for evaluation and he was identified as a special needs student by the start of the first grade.

During Ms. Richard's involvement with K.M., Mr. Peterson, the then WES principal, apprised Superintendent Davis about a challenged child in Ms. Richard's classroom. *Davis Tr.* 6:24-7:15. Based in part on Ms. Richard's involvement with K.M., Superintendent Davis developed concerns about Ms. Richard in the spring of

2014.  In his view, Ms. Richard seemed to be having annual problems with one or more of her students.  Superintendent Davis, however, did not have any direct knowledge about Ms. Richard's teaching ability and instead relied upon Mr. Peterson, the WES principal, to advise him.

### E.  Administrative Changes: 2013-14 to 2014-15

During the 2013-14 school year, Mark Peterson was the principal for WES. Upon his retirement at the end of the 2014 school year, RSU 57 named Christine Bertinet as the new principal and Melissa Roberts as the new vice-principal.  Ms. Bertinet joined WES as the assistant principal in 2012.  Based on her prior experience with them, when RSU 57 named Ms. Bertinet and Ms. Roberts as principal and vice-principal, Ms. Richard was encouraged.

### F.  Events Before and at the Beginning of the 2014-15 School Year

When Ms. Richard received her student roster for the fall of 2014, she had been assigned eighteen students.  This number was increased in late June, 2014 to twenty-two.  Of the twenty-two students, Ms. Richard initially did not know whether any students had an IEP.  That summer, she learned that three students had been identified as requiring special education services: K.N., G.T. and L.S.

#### 1.  G.T.

On August 1, 2014, Ms. Richard wrote to Jamie Paige, a fellow kindergarten teacher who had attended G.T.'s transitional IEP Team meeting, for information concerning G.T.  *Trial Ex.* 107 at 2.  Ms. Paige responded the same day.  *Id.* at 1.  She told Ms. Richard that G.T. "still can get angry and aggressive."  *Id*.  She wrote that

he will "destroy the work of others, hit/kick peers, and yell at peers and teachers. He will tell his teachers to shut up." *Id.* She went on to describe other behavioral and academic issues. *Id.* She had some suggestions for dealing with G.T. *Id.* Ms. Paige said, however, that neither she nor G.T.'s preschool teacher thought he needed a special education technician, but "there needs to be a plan in place to help him on the occasions he is aggressive and needs a break." *Id.*

Ms. Richard wrote to Ms. Bertinet on August 6, 2014:

> I want to be sure that I am ready for this child. He is coming from a small student to teacher ratio. It sounds like, from the notes below and the mom, that he needs a lot of support. He demonstrates aggressive behaviors and verbal outburst. I really am not comfortable with his placement in my class without G.T. receiving in-class support. If I had 5 students it might be different, but I have twenty something. There is a lot of stimuli, and currently meeting all the needs he has in that type of framework, seem [sic] like a constant task for at least his acclimation period.

*Id.*

### 2. The Missing IEPs

RSU 57 failed to provide Ms. Richard with copies of the IEPs for the three special education students at the beginning of the school year, despite Ms. Richard's numerous requests. None of the student's file folders in the WES office contained these critical documents. Ms. Richard made over a dozen requests for assistance in obtaining the missing IEPs.

On September 6, 2014, Ms. Richard emailed Ms. Bertinet requesting that she be provided with the IEPs for the three special education students. *Id.* 16 at 1 ("I still need the IEP's"). Ms. Bertinet responded that she had told all case managers to distribute the IEPs and that she would follow up with "Carolyn." *Id.* Without the

IEPs for the special needs students, Ms. Richard was left "in the dark." Ms. Richard received the first of the three IEPs in early October 2014 and she wrote to Ms. Bertinet: "I find it pitiful that it has taken this long, for me his K teacher, to receive the document. I have been actively pursuing it, since August. I, until today, had no information on his goals or necessary class accommodations." *Id.* 26 at 1. Ms. Richard did not receive the IEPs for the other two special education students until later in October, 2014.

### 3. Rutharian Gregoire: Educational Technician II

RSU 57 provided Ms. Richard with in-class support in the form of an Educational Technician II named Rutharian Gregoire, who assisted with the three identified special education students. However, Ms. Richard noticed that Ms. Gregoire was being pulled out of her classroom and no one would come in to replace Ms. Gregoire. Ms. Richard received no advance notice of Ms. Gregoire's absence from the classroom and no substitute. Ms. Richard was left to try and find coverage on her own, if she could; otherwise, the students with disabilities were left without the educational technician services their IEPs specified.

### 4. T.K. and L.P.

At some point, Ms. Richard learned that in addition to the three students identified as special education eligible, the class contained two other students who were suspected of needing special education services: T.K. and L.P. At the Open House, T.K.'s mother told Ms. Richard that T.K. would be receiving special education services, that he was daydreaming, and that he had social issues. T.K.'s mother said

that she thought he needed both physical and occupational therapy. Ms. Richard noticed that T.K. engaged in disruptive and violent behaviors that hurt classmates and that he showed no remorse. T.K. often engaged in negative behaviors when he thought no one was watching him and he was unable to function successfully in class without an adult sitting right next to him.

From the start of the school year, Ms. Richard noticed that L.P.—although not identified with an eligible disability—exhibited odd behavior and mannerisms, engaged only in parallel play, made no eye contact, and at times would be dysregulated and have meltdowns, including swearing and engaging in physical violence. L.P. also made mean comments to his classmates and at one point he threw an iPad at the window.

Over time, Ms. Richard suspected that both T.K. and L.P. had underlying disabilities that were contributing to their poor classroom behaviors. In September, 2014, Ms. Richard reported L.P.'s behavior issues and his apparent need for additional support to WES administrators. By early November, 2014, Ms. Richard had done the same for T.K. Ms. Richard did not, however, request that either T.K. or L.P. be removed from her classroom.

In response to Ms. Richard's continued requests for support for T.K. and L.P., the administrators sometimes checked in on the classroom, or responded to Ms. Richard's buzzing the principal's office. Ms. Richard sought out and received advice and some modeling from Melissa Roberts, who is a trainer in Responsive Classroom techniques.

The WES administrators also asked Ms. Winship, the behavior specialist, to check with Ms. Richard. Ms. Winship is not a Board Certified Behavior Analyst; she is a special education teacher. Ms. Winship had just begun her first public school position after teaching preschool at Waban in Sanford, Maine. Ms. Winship conducted some brief observations in Ms. Richard's classroom, but she did not become directly involved in assessing T.K. or L.P.'s behavioral needs. She created a "behavior plan" for L.P. and told Ms. Richard to keep track of L.P.'s behavior on the behavior chart that Ms. Gregoire originally designed. *See id.* 41, 47, 124. When Ms. Richard asked for help with T.K., Ms. Winship advised her to use the same behavior plan and charts for T.K. without assessing T.K. Ms. Richard, with the assistance of Ms. Gregoire, completed the behavior charts for both T.K. and L.P. and awarded stickers and positive reinforcements as suggested by the plan. However, the behavior plan was not successful in reducing or eliminating the negative behaviors that both of these boys continued to exhibit. T.K. and L.P. continued to misbehave and hurt some of their peers in Ms. Richard's class. Two students in particular, B.D. and C.S., were frequent targets of T.K. and L.P.'s negative behaviors.

### G. Ms. Richard's Early Relationship with Principal Bertinet and Vice Principal Roberts

Ms. Richard was initially encouraged by RSU 57's appointment of Christine Bertinet and Melissa Roberts as principal and vice-principal of WES. For example, in an email exchange on Saturday, September 20, 2014, Ms. Richard wrote to Ms. Bertinet:

> I wanted to extend a serious thank you for being a hands on principal! You have been really receptive to staff. This week I felt like I could

provide better personalized communication to families, b/c there was a little more time on my plate. I like open relationships with families when it isn't coming out of my own family time. I think you know that I am not an 8:30 to 3:30 type girl, but the additional time during the school day has been most appreciated! ♥

*Id.* 22 at 1. Principal Bertinet responded on Sunday, September 21, 2014:

I REALLY appreciate this email more than you know.
Thank YOU for all you do.

*Id.*

During November, 2014, an issue arose about the scheduling of parent-teacher conferences. Not realizing that the scheduling was controlled by the collective bargaining agreement, Ms. Bertinet and Ms. Roberts scheduled the conferences during Thanksgiving week. Ms. Richard knew that this violated the collective bargaining agreement and she informed both Ms. Bertinet and Ms. Roberts. Ms. Richard thought that Ms. Bertinet and Ms. Roberts, being new at their administrative jobs, had simply made a mistake. *Id.* 27 at 2-3. Both Ms. Bertinent and Ms. Roberts told Ms. Richard that they had no idea of the violation. Ms. Roberts apologized at a staff meeting and on November 5, 2014, both Ms. Bertinet and Ms. Roberts clarified the issue in a joint email to WES staff. *Id.* at 1. Ms. Bertinet apologized to Ms. Richard in an email also dated November 5, 2014. *Id.* at 2. In response, Ms. Richard wrote to Ms. Bertinet, saying "You and Melissa rock!" *Id.* On November 8, 2014, Ms. Bertinet thanked Ms. Richard for being "so open and so positive." *Id.* 28 at 1. Ms. Richard replied by thanking Ms. Bertinet for being so "caring about your staff." *Id.* 29 at 1. Ms. Bertinet responded, "Thanks, Charlene. I

appreciate your input and support. Yes, we all need to feel like we're working toward common goals and develop a culture of support and openness." *Id.*

In early November, Ms. Richard requested paperwork to refer both T.K. and L.P. to the Student Assistance Team, because she realized that both students required more services than she could provide, given her overall responsibility to a class of over twenty kindergarteners. Even so, as of mid-November, 2014, there was no adversity between the WES administration and Ms. Richard, despite her recommendations concerning T.K. and L.P. As of mid-November, 2014, Ms. Richard described her relationship with Principal Bertinet and Vice Principal Roberts as "excellent."

### H. The "Break Room" Incident

After WES became the host elementary school for RSU 57's "Behavior Program" in 2014-15, it began a new feature, called the "break room" for behavioral students. Located in a converted office along the same hallway as the kindergarten classrooms, the break room was three doors down from Mr. Richard's classroom and two doors down from Jennifer Elsaessor's classroom. Ms. Elsaessor was another kindergarten teacher at WES.

The location of the break room meant that both Ms. Richard and Ms. Elsaessor's classes heard screaming and swearing from the break room and occasionally, the teachers had to close or lock the doors to their classes to keep their students from being scared by the noise. Specifically, students in the break room were heard screaming, "Let me out", and using "disgusting language." On three

occasions, students who were in Ms. Richard's classroom began crying because of what they were hearing.

On November 19, 2014, Ms. Bertinet emailed Ms. Richard to alert her that she had been informed that Ms. Richard had "escorted one of [her] students to the [break room] and secluded him." *Id.* 30 at 1. Ms. Bertinet wrote that there were "a couple of things I need to address with you." *Id.* She asked Ms. Richard whether she had written a seclusion report or contacted the student's parents. *Id.* She went on to write that "Nichole Winship [the behavior specialist] must be involved in all decisions regarding the use of this break space. This is something that has been mentioned previously and needs to be followed." *Id.*

Ms. Richard replied later that day, stating that she had "NEVER brought anyone to the break room." *Id.* at 2. Ms. Richard denied telling "anyone to take a student there. I have a United States rug, in my room, that is used for any student that feels a break is needed. :)." *Id.* Ms. Bertinet initially responded by thanking Ms. Richard for clarifying and indicated that this is the way the incident had been reported to her. *Id.* It turned out that Ms. Gregoire, the Education Technician II, had brought L.P. to the break room at L.P.'s request just to show him the room.

Despite the fact that she had not brought L.P. to the break room, Principal Bertinet, Vice Principal Roberts, and Ms. Winship demanded that Ms. Richard complete a seclusion report. On November 20, 2014, Ms. Richard emailed Ms. Bertinet, Ms. Roberts, and Ms. Winship (with a copy to Mr. Nash) asking for clarification about the use of the break room. *Id.* 31 at 1-2. She requested guidelines

for the use of the room, saying that she had never been informed about the parameters for use of the space, and she thought she might have to use it in the future. *Id.*

Ms. Richard reported that she had seen Ms. Winship holding the break room door closed with a student inside the room and she had overheard Ms. Winship asking a janitor to remove the inside handle of the door to the break room. *Id.* Ms. Richard cited a portion of the Administrative Procedures Manual that prohibited securing the door against the student or holding the door shut while the student was in the room. *Id.* She reiterated that she had "never requested or directed any of my students be placed in the time-out room." *Id.* at 2. Ms. Richard raised questions about the incident and wrote that she did not want to make guesses and assumptions on official paperwork; she suggested that it would be better if the parties directly involved in and overseeing the decision filled out the report. *Id.* Ms. Richard notified Mr. Nash because she worried she was getting in trouble with administration for failing to complete the report.

After Ms. Richard sent the November 20, 2014 email, she noticed that Ms. Winship's attitude toward her seemed to change. Previously, Ms. Winship had been friendly, but after the email, Ms. Winship would not look at Ms. Richard. Ms. Bertinet asked Ms. Richard why she had sent a copy of her November 20, 2014 email to Mr. Nash, the union representative.

## I.     The Parent-Teacher Conferences and SAT Referrals

The parent-teacher conferences at WES took place just before the Thanksgiving Day recess on November 14, 2014. At other conferences, Ms. Richard learned more from other parents about the scope of T.K. and L.P.'s misbehaviors against other students in her classroom. At least eight families informed her that the behavior of these two boys, whom they knew by name, was harmful and unacceptable. Due to growing issues with T.K.'s behavior, which Ms. Richard had flagged, both WES administrators attended his conference.

Even though Ms. Richard could not directly refer either T.K. or L.P. for evaluation by the IEP Team, she referred them to WES's SAT. After school on Tuesday, December 2, 2014, while waiting for an evening PTO meeting, Ms. Richard completed an old version of the WES referral form to the SAT for both T.K. and L.P. and she dated the referral forms the next day. *Id.* 34, 35.

**J.      T.K.'s Acting Out: C.S. and her Parents' December 2, 2014 Email**

On December 2, 2014, the parents of C.S., one of Ms. Richard's students, wrote an email to Ms. Richard with a copy to Principal Bertinet, placing them on notice that C.S. complained to her parents that evening that T.K. had tried to pull down her pants and underpants that morning during the morning meeting. *Id.* 33 at 1. C.S. asked T.K. three times to stop. *Id.* When asked whether she had experienced previous problems from T.K., C.S. reported that T.K. had tried to push her into a teacher's desk. *Id.* Also, the parents wrote, on Halloween, C.S. had come from school with her hands red and swollen and when her parents had asked what had happened, C.S. told them that while she was washing her hands, T.K. had turned on the hot

water. *Id.* The parents attached a photograph of C.S.'s hands that they had taken on Halloween. *Id.* They asked that WES act to protect their daughter from T.K. and asked to know what steps WES had taken regarding T.K. *Id.* Ms. Bertinent forwarded C.S.'s parents' email to Ms. Richard on December 2, 2014, noticing that it appeared that C.S.'s parents had used an incorrect email for Ms. Richard. *Id.*

Ms. Richard was aware of the incident. As it turned out, Vice Principal Roberts had been in Ms. Richard's classroom when the incident took place. After the session, C.S. approached Ms. Richard and told her about T.K.'s putting his hands down the back of her pants and pulling down her pants and underpants while they sat in a circle. Ms. Richard called Ms. Roberts over and they discussed the incident with C.S. in the hallway. C.S. did not mention anything about T.K. playing with her belt loops; her pants had an elastic waist and no belt loops.[4]

Ms. Richard explained the context for the hot water incident. There was a sink in Ms. Richard's classroom and the hot water produced scalding 140 degree water. Ms. Richard had taped down the hot water handle with pink duct tape to prevent students from using it and she made it clear to the students that the hot water tap was off limits. Nevertheless, on October 31, 2014, T.K. turned on the hot water tap

---

[4]     Vice Principal Roberts had a different memory of this incident and C.S.'s complaint. Even though Ms. Roberts was in the classroom when it happened, she admitted that she had not noticed it during the lesson, because her back was to the classroom. Ms. Richard and Rutharian Gregoire were also in the classroom at the time and did not see T.K.'s misconduct.

Ms. Roberts recalled C.S. being shy about reporting the incident but testified that C.S. had only complained that T.K. had been flipping on her belt loop, pulling and tugging at it.

The Court accepts Ms. Richard's recollection of the incident over Vice Principal Roberts' memory. Ms. Richard's recollection, namely that T.K. had tried to put his hands down C.S.'s pants and had tried to pull down her pants and underpants, is consistent with what C.S.' parents indicated to Principal Bertinet and Ms. Richard that C.S. had told them the evening of the incident.

and had burned C.S.'s hands. Ms. Richard told Principal Bertinet that T.K. was sneaky and that he had been hurting students in her classroom on a daily basis.

### K. L.P. and B.D.

The morning of Wednesday, December 3, 2014, L.P. walked into the classroom. Ms. Richard said, "Good morning," but L.P. walked by and did not respond. He then threw his glasses on the floor. At that point, L.P. picked up a chair and threw it at a classmate, B.D., striking him on the head. B.D. had been bent down looking into his cubby. B.D. was sent to the school nurse.

Ms. Richard spoke to Principal Bertinet about the incident, but L.P. was back in her classroom in ten to fifteen minutes. Ms. Richard told Principal Bertinet that L.P. needed services and Ms. Richard reminded her about the three IEPs and L.P. plus T.K. being in her classroom. Principal Bertinet suggested that Ms. Gregoire might be able to assist, but Ms. Richard reminded Ms. Bertinet that Ms. Gregoire had her hands full with the three IEPs in the Richard classroom.

B.D.'s parents complained about B.D.'s safety in Ms. Richard's classroom. Later that day, B.D.'s mother met with Vice Principal Roberts about the situation. Vice Principal Roberts told B.D.'s mother that WES was "collecting data" and was "working on the situation." B.D.'s mother was not satisfied with Vice Principal Roberts' response.

### L. B.D.'s Mother Complains to Superintendent Davis

On December 4, 2014, B.D.'s mother called Superintendent John Davis to complain about the lack of safety in the classroom for her son.[5] B.D.'s mother was herself educated and experienced as a teacher. She held a master's degree in administration and was certified as a teacher in K through Eighth Grades. She had worked at RSU 57, teaching Fourth Grade from 2006 through 2008, and was currently a teacher at the Gray-New Gloucester middle school.

B.D.'s mother told Superintendent Davis that B.D. had been subjected to physical abuse while at WES. She told him that he had come home reporting that he had been hit and kicked. She had questioned her son about what he was doing to bring on this abuse. She told Superintendent Davis that her son had been kicked in the private parts, that a chair had been thrown at his head, that he had been punched and stepped on, and that his hand had been held under hot water. She also said that her son was being choked on the playground and could not breathe so he had hit another child.

B.D.'s mother reported that she had discussed this matter with Vice Principal Roberts, but that Ms. Roberts had told her that they were "collecting data on the other child so they could figure out a placement." B.D.'s mother told Superintendent Davis that she told Vice Principal Roberts that her child was not "a punching bag."

---

[5]    In its proposed findings, RSU 57 proposed that the Court find that B.D. himself had behavioral issues: "Although their son, BD, had exhibited some challenging behaviors himself, *see* Trial Ex. 43 (struggling with listening, trying to wrestle with other students, threatening to punch a girl)." DPFOF ¶ 41. The Court has not included these facts in its recitation of the relevant evidence. B.D.'s issues, such as they were, did not justify L.P. throwing a chair at his head and causing B.D. to have to go to the school nurse. The Court is unclear why B.D.'s behavioral issues are relevant.

B.D.'s mother spoke in complimentary terms about Ms. Richard. She asked Superintendent Davis what RSU 57 had done to evaluate the boys who had been aggressive with her son, asking if RSU 57 had completed a risk analysis on them. B.D.'s mother thought that Superintendent Davis was rude and disrespectful toward her. B.D.'s mother pressed for a meeting with Superintendent Davis and one was scheduled for the afternoon of Monday, December 8, 2014, to be attended by both of B.D.'s parents.

### M.    The December 8, 2014 Meeting

On Friday, December 5, 2014, Superintendent Davis notified Ms. Richard that he was convening a meeting. *Id.* 36. The notice read:

> Folks, I have received word from a few parents that they have a concerns [sic] about the classroom and the conduct of the 5 year olds in the room. I will be at WES on Monday to meet with the you [sic] to discuss the issues and what our staff is doing about these concerns. I sent a calendar invite. We will meet at 11:45 in Ms. Bertinet's office. Thank you.

*Id.* 36 at 1. Superintendent Davis sent the notice to Principal Bertinet, Vice Principal Roberts, Ms. Richard, and Clinton Nash, the union representative. *Id.* Ms. Richard responded on Saturday, December 6, 2014:

> Thank you for taking the time to discuss what is occurring with my learners. Christine and Melissa have been really supportive. We have even met with the parents of both children, whom were just as frustrated and not sure what step to take next. Normally with a little behavior molding and a structured school day, my class is a wonderful place to learn. I am hoping with your experience, you might have some suggestions also. :)

*Id.*

### 1.    Charlene Richard's Recollection of the Meeting

Ms. Richard was both hopeful and scared about the meeting. She was worried about the fact that Superintendent Davis had copied Clinton Nash, the local president of the Maine Education Association. The morning of the scheduled meeting, Ms. Richard went to see Principal Bertinet. Ms. Richard sat down, became emotional, and started to cry, saying that she was concerned about Mr. Nash being there. Principal Bertinet consoled Ms. Richard, rubbing her back. Principal Bertinet replied that she only knew what was in the notice and she reassured Ms. Richard that "it will be fine." Ms. Richard brought along to the meeting the behavior charts for both T.K. and L.P., the behavior plan for L.P., and her SAT referrals for both children.

On December 8, 2014, Ms. Richard, accompanied by Clinton Nash, met for about forty-five minutes with Superintendent Davis, Principal Bertinet, and Assistant Principal Roberts. At the meeting, Superintendent Davis' tone was serious, scary and angry. He began the meeting by accusing Ms. Richard of breaching confidentiality with parents. He told Ms. Richard that if she had breached student confidentiality, they would be having a very different conversation.

He told Ms. Richard that she was "pathetic" and that RSU 57 had wasted ten years on her. Superintendent Davis declared that if Ms. Richard could not handle twenty or something students, they would find her a job she could handle. He said that parents had been complaining about her "for years." Ms. Richard asked him who had complained about her and Superintendent Davis did not answer her question. Indeed, even though she had brought along the students' charts and the SATs and

she tried to discuss the students, Superintendent Davis did not allow Ms. Richard to speak in her own defense.

Superintendent Davis announced that Principal Bertinet and Vice Principal Roberts both thought that Ms. Richard was targeting T.K. and L.P. He stated that C.S. had never had her hands burned by T.K. and that instead C.S. had eczema, which explained her hand redness. He also asserted that T.K. had never put his hands down C.S.'s pants, that it "never happened."

Superintendent Davis told Ms. Richard that "you are the problem, not the boys." He told her that he was sending her a memorandum, which would set forth the administration's expectations going forward. He informed her that Stacy Jette, an educational technician, would be the "eyes and ears" of the administration, and that they would be watching her to see if she was targeting these boys. He ended the meeting by telling Ms. Richard, "Now get back to class and teach."

### 2. Clinton Nash's Recollection of the Meeting

Clinton Nash recalled the meeting as "tense and fraught." He said that he became nervous even though he was not the object of Superintendent Davis' anger. He remembered that Superintendent Davis started off the meeting by accusing Ms. Richard of giving confidential information about one student to the parents of another student. He said that Superintendent Davis questioned Ms. Richard's ability to teach non-cookie cutter kids. Mr. Nash said that neither Principal Bertinet nor Vice Principal Roberts contradicted Superintendent Davis' accusations and neither spoke on behalf of Ms. Richard. Mr. Nash recalled that Ms. Richard tried to present some

of the documents she had brought along and Superintendent Davis said that this was not the time for documents.

### 3. Melissa Robert's Recollection of the Meeting

Vice Principal Roberts acknowledged that she was nervous before the December 8, 2014 meeting with Superintendent Davis because this was the first time she had been called to a meeting with the Superintendent over a parental complaint. At the meeting itself, she also admitted that she became nervous. She said that Principal Bertinet started the meeting by describing the background, but that Superintendent Davis interrupted Principal Bertinet. Vice Principal Roberts described Superintendent Davis as "clear, direct and stern." She did not recall Superintendent Davis calling Ms. Richard pathetic or telling her that RSU 57 had wasted ten years on her. She agreed that Superintendent Davis did not criticize either Principal Bertinet or herself during the meeting.

### 4. John Davis' Recollection of the Meeting

Superintendent Davis recalled that he had concerns about Ms. Richard's ability to manage her classroom that went back at least to her experience with K.M. upon his transfer from the Reiche School. He remembered that Mr. Peterson, the then WES Principal, had informed him that they had moved K.M. out of Ms. Richard's classroom. By the time of the December 8, 2014 meeting, Superintendent Davis was "beginning to wonder" whether K.M.'s transfer to another classroom had been Ms. Richard's fault.

Superintendent Davis agreed that his conversation with B.D.'s parents had precipitated the December 8, 2014 meeting. He said that he first spoke to B.D.'s parents on the telephone and later met with them. He said that he became concerned that B.D.'s parents knew the names of the other students and other intimate details about the other students. He thought Ms. Richard had been feeding information about the other students to B.D.'s parents. He remembered that Ms. Richard denied breaching confidentiality. *Davis Tr.* 18:23-19:6. But, he agreed that he did not accept her denial and told her that if she had done so, he would open an investigation. *Id.* 19:7-10.

Superintendent Davis explained that he copied Mr. Nash about the meeting because Mr. Nash complained to him earlier about there being too many meetings between administration and individual teachers without union representation.

Superintendent Davis recalled that Principal Bertinet began the meeting and that he interrupted her early on. Superintendent Davis acknowledged that he began the meeting by accusing Ms. Richard of breaching student confidentiality and that he warned her that if he found out that she had done so, he would initiate an investigation. Superintendent Davis agreed that he had been "sharp in tone." *Id.* 18:11-13. Superintendent Davis admitted that B.D.'s parents had not complained about Ms. Richard and in fact were positive about her. He did not recall whether he told Ms. Richard that parents had been complaining about her for years, but he acknowledged that he may have done so. He could recall no parental complaints

about Ms. Richard and could not remember any parent ever complaining that Ms. Richard had not taught their children well.

Superintendent Davis admitted that he was frustrated because he thought the students were being asked to bear the brunt of responsibility for problems in the classroom. He stated that he thought they were blaming the children for what was an adult responsibility and they were victim blaming. He emphasized that no one was taking responsibility. He agreed that he was frustrated and angry, but he asserted that he was frustrated and angry at everyone, including himself.

Superintendent Davis agreed that Ms. Richard attempted to present documents at the December 8, 2014 meeting, but he had told her the meeting was not the appropriate place to review the data. He explained that this was not "the purpose of the meeting." *Id.* 23:21-23. He denied telling Ms. Richard that RSU 57 had wasted ten years on her, but he acknowledged that he questioned Ms. Richard's classroom management.

### 5.     Christine Bertinet's Recollection of the Meeting

Christine Bertinet was caught off guard that B.D.'s parents had gone directly to Superintendent Davis. She thought that Superintendent Davis scheduled the December 8, 2014 meeting to explain what support RSU 57 was going to extend to Ms. Richard. Ms. Bertinet remembered reassuring Ms. Richard on December 5, 2014 that Superintendent Davis bore her no ill will.

Ms. Bertinet began the meeting by letting the Superintendent know that they had a plan. Ms. Bertinet recalled Superintendent Davis emphasizing the importance

of student confidentiality, but she did not remember that Superintendent Davis accused Ms. Richard of breaching confidentiality. Ms. Bertinet remembered Superintendent Davis insinuating that a veteran educator should have been able to handle the classroom more effectively than Ms. Richard had been able to do. In light of Superintendent Davis' tone, Ms. Bertinet realized that she had work to do in order to convince Superintendent Davis that they were responding appropriately. Ms. Bertinet remembered that Superintendent Davis mentioned the investment RSU 57 had made in her.

Ms. Bertinet conceded that at the meetings, she stated that she had concerns about Ms. Richard's classroom performance. She also agreed that the December 8, 2014 meeting was not collaborative. Ms. Bertinet agreed that Superintendent Davis did not criticize either Vice Principal Roberts or herself during the December 8, 2014 meeting and did not request that any memoranda be placed in their personnel files. At the end of the meeting, Superintendent Davis directed Ms. Bertinet to follow up in writing so there would be no ambiguity.

### N.     The December 8, 2014 Bertinet Memorandum and Charlene Richard's Response

After the December 8, 2014 meeting, Ms. Bertinet gave Ms. Richard a folded envelope and followed it up with an email. *Trial Ex.* 40. The contents of the folder and the email were the same and stated in plain and bold print:

> Recently, concerns have been brought to my attention around classroom management and how it is impacting student safety; **these concerns stem in part from an inconsistent follow-through on implementing the behavior plan that was developed by the Behavior Coach, as well as strategies presented to you by Assistant Principal.** As the superintendent mentioned in our meeting

this morning, he, too, is becoming increasingly concerned about your behavior management strategies. In order to address these concerns, I am going to expect that you follow the expectations outlined below:

1. **Behavior Plan Implementation:** Adhere to the current behavior plan being monitored by the Behavior Coach. Should you have any questions, please consult with Mrs. Roberts or me.

2. **Behavior Management Techniques Implementation:** Mrs. Roberts and the Behavior Coach will continue to model and coach behavior management strategies, such as 1. student travel strategies; 2. provide students with modeling and reinforcing of expected behaviors; 3. reassure students of time frame check-ins; 4. prompt students to access their independent and/or differentiated work binders as needed; 5. other strategies discussed during in-class coaching.

3. **Parent Communication:** Keep me abreast of all parent communications from now on, including email, phone, and parent conferences/meetings.

I realize that adjusting your current practices will require attention to details you may or may not be familiar with, but want you to know that we will support you with regular feedback. For the next 3-4 weeks, we will make every effort to provide educational technician support while data is being collected. We will reconvene on January 14th at 11:45 am to review data and discuss next steps.

*Id.* Principal Bertinet copied this memorandum to Superintendent Davis and to Ms. Richard's personnel file. *Id.*

When Principal Bertinet met Ms. Richard after the memorandum, she said to her, "Listen, I know you are upset with me." Ms. Richard responded, "I am disgusted that my students go to a school, where the principal is such a liar." Principal Bertinet replied, "I'm sorry you feel that way."

Shortly after receiving the Bertinet memorandum, Ms. Richard emailed Principal Bertinet to clarify matters. *Id.* 41. Ms. Richard said that she had been using the behavior chart for both students, which was verified by her signed and

returned copies from their parents. *Id.* at 2. She asked what part of Nicole Winship's coaching was she not using. *Id.* She asked Principal Bertinet to be specific because she wanted to know "where my short comings are." *Id.* She said the behavior coach had given her a plan only for one child and she asked when the plan for the other child would be forthcoming. *Id.* She also inquired specifically about other statements in the Bertinet memorandum. *Id.* Principal Bertinet replied that she and Vice Principal Roberts would like to sit down with Ms. Richard and "discuss the ways in which we can and will support you." *Id.* at 1.

On December 9, 2014, Principal Bertinet and Vice Principal Roberts met with Ms. Richard in her classroom. Ms. Bertinet said to Ms. Richard, "I'm sorry. I did not know the meeting was going to be like that. I have never seen Dr. Davis that way." Vice Principal Roberts added, "I almost peed my pants."

Knowing that Ms. Richard particularly objected to the bold part of the Bertinet memorandum, which described her inconsistent follow-through, Principal Bertinet agreed to remove the bold language. When she told Ms. Richard, Principal Bertinet said that she would do so, even though Dr. Davis will be mad. On December 15, 2014, Principal Bertinet issued another memorandum, which removed the bold portion of her December 8, 2014 memorandum. *Id.* 39. Ms. Richard thanked Principal Bertinet for deleting the bold part of the December 8, 2014 memorandum.

### O. T.K., B.D., Charlene Richard and the RSU 57 Administration

The Court has found that the RSU 57 administration waged a campaign against Ms. Richard following the December 8, 2014 meeting. One example of this

campaign involves B.D.'s continued troubles with T.K. in Ms. Richard's classroom after the December 8, 2014 meeting. On February 3, 2015, Ms. Richard observed an incident involving T.K. and a female classmate in which T.K. had hit the girl. Ms. Richard brought the girl to Ms. Bertinet's office and she overheard Ms. Bertinet asking the girl what B.D. had done to her. The girl told Principal Bertinet that it was T.K., not B.D., but Ms. Bertinet decided to call B.D. to her office.

On February 3, 2015, B.D.'s father emailed Principal Bertinet about B.D. being called to the principal's office that day and asked whether there had been an incident that had led to his son's trip to the principal's office. *Id.* 65. Principal Bertinet emailed B.D.'s father and reassured him that the principal office visit was "simply a friendly check-in." *Id.* B.D.'s father emailed back on February 4, 2015, indicating that he considered a trip to the principal's office more significant. *Id.* He wanted to know what had caused B.D. to be "pulled from the learning environment" and wondered if B.D. had a target on his back. *Id.* Principal Bertinet responded by suggesting a phone call. *Id.* Principal Bertinet and B.D.'s father spoke by telephone that afternoon.

Meanwhile B.D.'s mother emailed Principal Bertinet repeating their concerns about B.D. being targeted by the administration and wondering whether their advocacy for their son was causing problems for him. *Id.* Principal Bertinet responded to B.D.'s mother's email by reassuring her that the administration was not targeting B.D. and that

> Administration meets with children on a regular basis when staff members bring safety concerns to our attention. We will contact you

should there be a need in the future.  <u>I will be touching base with Mrs.</u>
<u>Richard to discuss a communication plan so that we're all on the same</u>
<u>page.</u>

*Id.* (emphasis supplied).  B.D.'s mother responded the next morning:

> The miscommunication happening is from administration and not the
> teacher.  I do not know why you are bringing Mrs. Richard into this?
> She is doing a great job and I feel like she is the only positive thing in
> my son[']s life while at WES.
>
> Please understand that if there are any concerns in the classroom, Mrs.
> Richard has made us aware.  Her only concerns so far are minor
> academic problems.  She has been doing her job as the classroom
> teacher.

*Id.*

On March 5, 2015, B.D.'s mother emailed Ms. Bertinet again, this time

reporting that T.K. had turned the hot water on B.D.'s hands and B.D. was burned.

*Id.* 70.  The school nurse informed B.D.'s mother that it was an accident, but when

B.D. arrived home, he told his mother that T.K. had deliberately turned the hot water

faucet on his hands.  *Id.*  B.D.'s mother asked to be informed whether there was a

witness and whether the incident was deliberate.  *Id.*  Principal Bertinet replied that

she would check with Ms. Richard.  *Id.*  Ms. Richard replied that she could not identify

the other student, but that when B.D. had gotten to the sink to wash his hands, he

said "Hey, ouch" and asked the other student "why s/he had done that."  *Id.*  B.D.'s

father responded that they had already identified the other student.  *Id.*

On March 11, 2015, Principal Bertinet emailed B.D.'s parents to inform them

that Ms. Richard had taken B.D. to the school nurse because another student had

stepped on B.D.'s hand.  *Id.* 72.  Principal Bertinet stated that "This did not appear

to be an intentional action on the other student's part."  *Id.*  However, B.D. had told

Ms. Richard that T.K. had admitted it and smiled. On March 12, 2015, B.D.'s father replied, "If B.D. tells me it was T.K. or L.P., we're going to have a big problem." *Id.* Principal Bertinet responded that "Administration is looking into this further. Please understand that we take all classroom safety issues very seriously. We met with Mrs. Richard yesterday to get more information about what transpired." *Id.*

This response provoked an email from B.D.'s mother, who wrote that as a parent she did not feel "that you are taking SAFETY seriously." *Id.* She said that B.D. has had a "never ending list of injuries . . . by the same two students." *Id.* She complained that "the lack of communication and effort to cover up events that you label as accidents, is unacceptable." *Id.* She reiterated that "I feel like Mrs. Richard is doing her best, but I do not feel like you are supporting her as a teacher." *Id.*

On March 13, 2015, Principal Bertinet emailed B.D.'s parents and informed them that she was assigning Vice Principal Roberts to spend time each day in Ms. Richard's classroom and that an outside behavior specialist would come in and provide feedback. *Id.* 74. B.D.'s mother responded with a long email in which she castigated WES administration for wasting taxpayer money and reminded Principal Bertinet that these safety issues had persisted since October, 2014. *Id.* She wrote that "B.D. has been a punching bag since September, and [I am] appalled that you have not taken this more seriously. I am no longer waiting for 'the next incident' to occur nor am I willing to let my child be a target at WES while you continue to 'collect evidence.' *Id.* She threatened to go to the paper if there was another incident and warned, "I can only watch my child being bullied for so long before I take action." *Id.*

Principal Bertinet wrote B.D.'s parents the next day, outlining the WES administration's efforts "in supporting [Ms. Richard's] room in order to address all concerns." *Id.* 74-75.

Next, on March 17, 2015, Superintendent Davis wrote B.D.'s mother, informing her:

> The statements you have made are not consistent and inaccurate with what we are seeing and that is a result of you getting poor or inaccurate information.

*Id.* 123. Superintendent Davis told B.D.'s mother: "Your son is not being bullied." *Id.* He wrote: "Yes, your son's hand was stepped on during the time the teacher was distracted at the door with another situation . . . Your son was not injured, nor was he being targeted. This was not a bullying incident." *Id.* Superintendent Davis assured B.D.'s mother that "there are no dangerous children in this classroom." *Id.* He ended by saying that "I do know that my children, and I suspect your child, will exaggerate and embellish when recounting their day." *Id.*

On March 26, 2015, T.K. stood up, headed over to B.D., and kicked him hard. This precipitated an irate email from B.D.'s father, demanding action. *Id.* 78 ("Kicked in the private parts, punched in the face, stomped fingers, burnt hands, thrown chairs"). On April 1, 2015, Ms. Richard wrote Principal Bertinet and Vice Principal Roberts and stated that "later in the day, T.K. walked over to B.D.'s reading spot and kicked him." *Id.* 80. On April 2, 2015, Ms. Richard met with Principal Bertinet, Vice Principal Roberts, and Eleanor Roberts, and Ms. Richard told Principal Bertinet and Vice Principal Roberts that B.D. and others in her classroom were being targeted and repeatedly hurt by T.K.

On April 3, 2015, Principal Bertinet, Assistant Principal Roberts, Ms. Richard, and Diane McClemment, the school librarian, met with B.D.'s parents. B.D.'s parents read a definition of bullying and directly asked Ms. Richard whether B.D. was being targeted by other students in the classroom and Ms. Richard responded that "I think B.D. is one of the children that is targeted." After some further discussion, Principal Bertinet stated, "That is the first time that Ms. Richard has said that she felt he was being targeted." Ms. Richard responded, "May I clarify something? I have told you that I felt there were several students in my room being targeted and that's a fact that came up at the meeting yesterday." After some further discussion, Principal Bertinet stopped the meeting, saying that "there are some inconsistencies with what I'm hearing, what has been reported to you folks, what Mrs. Richard just shared. I'm going to stop."

During her testimony before this Court, Principal Bertinet testified that B.D.'s parents came into the meeting "visibly very agitated" with a "hostile" demeanor. She said that she felt uncomfortable and she could tell that Mrs. Roberts and others felt uncomfortable. She testified that she looked and Mrs. McClemment acknowledged that the meeting ought to be shut down. She said she asked B.D.'s parents to reconvene at a time that they could collaboratively come to the table. She testified that she told them the meeting was over and that they would need to reconvene at a later time; she said she asked B.D.'s parents to leave the school grounds. Vice Principal Roberts echoed Principal Bertinet's recollection, describing B.D.'s parents as "very angry" and "visibly upset."

There is a stark contrast between the recollections of RSU 57 administrative personnel and Ms. Richard concerning the events surrounding B.D. and T.K. The Court expressly finds Charlene Richard's version of the events surrounding B.D. and T.K. to be more credible than the version of the events recounted by RSU 57 administrative personnel. The Court finds that T.K. had in fact targeted B.D. and that RSU 57 administrators were aware of the targeting since the fall of 2014. The Court is baffled by the RSU 57 administration's persistent efforts to absolve T.K., to minimize his misbehavior, and to blame his victims.

To the extent there is doubt as to whether the administration or Ms. Richard has a more accurate memory of critical events, it is resolved by the tape recording of the April 3, 2015 meeting. B.D.'s parents made a tape recording of the meeting and Principal Bertinet's and Vice Principal Roberts' testimony is flatly contradicted by the actual tape recording. There is no indication that B.D.'s parents were either hostile or aggressive during the meeting. Principal Bertinet did not stop the meeting because she and others had become uncomfortable with B.D.'s parents. She stopped the meeting because she had made an inaccurate representation to B.D.'s parents about T.K. and Ms. Richard had told them a contradictory truth.

### P. Subsequent Actions by RSU 57 against Charlene Richard

The Court earlier set forth some of the details of RSU 57's campaign against Ms. Richard following the December 8, 2014 meeting. The campaign is summarized by Mr. Nash's testimony that Superintendent Davis came up to him at a later meeting and said, "What is it I need to do to have Charlene Richard resign?" Having received

this message in different words from Superintendent Davis during the December 8, 2014 meeting, the WES administration set about making the Superintendent's wish come true by exerting intense administrative pressure on Ms. Richard, ultimately causing her breakdown in the spring of 2015.

## V.  DISCUSSION

### A.  Charlene Richard's Prima Facie Case

As noted earlier, under the *McDonnell Douglas* analysis, Ms. Richard bears the initial burden of establishing a prima facie case of retaliation. To do so, she must prove that "(1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action." *D.B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012). "The burden of making out a prima facie case is 'not onerous.'" *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Applying these standards, the Court concludes that Ms. Richard has met her burden to prove a prima facie case of unlawful retaliation by RSU 57. Ms. Richard contends that her advocacy on behalf of disabled students in her classroom was the cause of Superintendent Davis' anger at the December 8, 2014 meeting and the ensuing cause of WES's retaliatory oversight and discipline. Both the Rehabilitation Act and the ADA prohibit "retaliation against any person, whether disabled or not, for opposing disability-based discrimination made unlawful by those statutes." *D.B.*

*ex rel. Elizabeth B. v. Espositio*, 675 F.3d 26, 40 (1st Cir. 2012). The same applies to the MHRA, 5 M.R.S. § 4633(1), and the WPA, 26 M.R.S. § 833(1).

The record amply reflects Ms. Richard's advocacy for T.K. and L.P. during the fall semester of 2014. Ms. Richard persistently complained to WES administration about its failure to identify T.K. and L.P. as disabled and its further failure to support her efforts to address their disabilities. She also complained to WES administration about its failures to properly respond to the students with identified disabilities: (1) Ms. Richard complained that she had not received the IEPs of the special education students, (2) Ms. Richard complained when the educational technician was removed from her classroom, (3) Ms. Richard advocated for T.K. and L.P. and urged the WES administration to perform special needs assessments for both students; (4) Ms. Richard referred T.K. and L.P. to the SAT, (5) Ms. Richard pressed WES administration when the data collection and generalized behavior plans proved inadequate, and (6) Ms. Richard persistently demanded that she receive educational technician support to respond to their misbehavior, which she perceived was related to their disabilities. These facts satisfy the advocacy requirement for a prima facie case.

RSU 57 argues that Ms. Richard's advocacy was not protected under the law because she did not claim that it engaged in any illegal conduct. *Def.'s Post Trial Mem.* at 14-15. The Court disagrees. *See D.B.*, 675 F.3d at 41 ("The general thrust of appellants' claims is that the Sutton school system retaliated against them for advocating on behalf of D.B.'s right under the Rehabilitation Act and the ADA to be

free from disability-based discrimination in the provision of a FAPE [free appropriate public education]. Such advocacy plainly constitutes protected conduct under these statutes"). Similarly, here, Ms. Richard's advocacy for T.K. and L.P. is protected conduct under both statutes and their Maine analogues.

The Court also finds that RSU 57's transfer of Ms. Richard and its implementation of the PIP constituted adverse action in the facts of this case. The legal standard is whether the employer's action is "one that might well dissuade a reasonable person from making or supporting a charge of discrimination." *Id.* at 41. It is true, as RSU 57 points out, that not all performance improvement plans constitute adverse actions. *Def.'s Post Trial Mem.* at 12-13 (citing *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011)). But here, context is all, and the Court finds that RSU 57 has been implementing Ms. Richard's PIP, not in a collaborative and constructive way, but in an unreasonable and punitive manner. RSU 57's PIP for Ms. Richard requires her to engage in minute by minute planning on pain of violating the plan. In fact, when Ms. Richard was just a few minutes off the planned transition from one subject to another, she was cited for violating the PIP, requiring a degree of punctuality and precision rare in the first grade. Being subject to a transfer and an invasive and unreasonably applied PIP would, in the Court's view, discourage the reasonable teacher from following Ms. Richard's example.

This leaves the question of causation. This is the most difficult of the three elements of Ms. Richard's prima facie case. As the Court will discuss, ultimately the

Court determines that an absence of causation requires her case against RSU 57 to fail. Nevertheless, her advocacy for her disabled students, RSU 57's failure to respond with any constructive assistance, and its decision to transfer and punish her, suffice for purposes of her prima facie burden of proof.

Moreover, the temporal proximity of Ms. Richard's filing of the SAT requests for T.K. and L.P. was "very close" to the December 8, 2014 meeting. *Abril-Rivera v. Johnson*, 806 F.3d 599, 609 (1st Cir. 2015); *Sánchez-Rodriguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 15 (1st Cir. 2012) ("'Very close' temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection"). In the *Sánchez-Rodriguez* case, for example, Mr. Sánchez-Rodriguz filed his EEOC complaint in February 2007 and was disciplined in May 2007, a time gap the First Circuit views as "close enough to suggest causation." *Id.* In the words of the First Circuit, "when harassment follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation." *Noviello v. City of Boston*, 398 F.3d 76, 86 (1st Cir. 2005).

Here, after school on Tuesday, December 2, 2014, while waiting for an evening PTO meeting, Ms. Richard completed an old version of the WES referral form to the SAT for both T.K. and L.P. and she dated the referral forms the next day, Wednesday, December 3, 2014. *Id.* 34, 35. These forms formalized a process by which the SAT Team would be forced to assess T.K. and L.P. and potentially designate them as special education eligible, a fact that Superintendent Davis acknowledged would have added additional costs to the RSU 57 budget. The temporal proximity between Ms.

Richard's filing the SAT forms for these two students and the December 8, 2014 meeting is "close enough to suggest causation." *Sánchez-Rodriguez*, 673 F.3d at 15.

In short, the Court concludes that Ms. Richard sustained her prima facie burden of proving the three elements of a claim of retaliation: (1) protected conduct, (2) adverse actions, and (3) causation.

## B. RSU 57's Legitimate, Nonretaliatory Reason for Its Adverse Actions

To explain its adverse actions against Ms. Richard, RSU 57 reiterates the difficult and occasionally chaotic nature of her classroom in the fall of 2014. *Def.'s Post Trial Mem.* at 1-2. RSU 57 points to examples of other kindergarten teachers who were able to control their classrooms despite having special needs students in the class. *Id.* at 3. Furthermore, RSU 57 maintains that Ms. Richard's response to the acting out of the boys in her classroom was to demand more educational technician support, rather than accepting her share of responsibility for the misbehavior in the class. *Id.* at 3 ("[R]ather than focusing on the specific techniques provided to her (student travel strategies, modeling and reinforcing expected behaviors, time frame check-ins, access to independent and or differentiated work), Plaintiff was concerned only about who else would be in her room to help her and that she not be blamed for the bad behaviors of the boys"). RSU 57 argues that when presented with the fact that Ms. Richard's classroom was unsafe, it "had an obligation to address the situation and that is what it attempted to do. That is not retaliation[.] [T]hat is responsible administration of a school." *Id.* at 4.

The Court concludes that RSU 57 sustained its burden to articulate a legitimate, nondiscriminatory reason for doing what it did. *Delgado Echevarria*, 856 F.3d at 134. This is only a burden of production, not persuasion. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000). Superintendent Davis' explanation was that he was frustrated with his perception that all the professionals in RSU 57, including Ms. Richard, were themselves responsible for the lack of safety in Ms. Richard's kindergarten classroom and it was not an acceptable response to blame the five-year old children in Ms. Richard's classroom. This explanation is sufficient, in the Court's view, to sustain RSU 57's burden of production.

## C.    Charlene Richard's Ultimate Burden of Persuasion

Once RSU 57 provided a satisfactory justification for the challenged action, "the *McDonnell Douglas* framework, with its intricate web of presumptions and burdens, becomes an anachronism. The [factfinder], unaided by any presumptions, must simply answer the question of whether the employee has carried the ultimate burden of proving retaliation." *Palmquist v. Shinseki*, 689 F.3d 66, 71 (1st Cir. 2012) (citations omitted). Ms. Richard bears this burden to prove her case by a preponderance of the evidence. *NLRB v. Wright Line*, 662 F.2d 899, 904 (1st Cir. 1981).

### 1.    Pretext

After a plaintiff has met her burden to prove a prima facie case of retaliation and her employer has sustained its burden of production to demonstrate a legitimate, nondiscriminatory reason for its adverse actions, the burden shifts back to the

employee to show that the proffered reason is "pretextual and that retaliation was the true reason." *Palmquist*, 689 F.3d at 71. The Court easily concludes that Ms. Richard has demonstrated that it is more likely than not that RSU 57's proffered reason for disciplining her was pretextual.

As the Court views it, Superintendent Davis' motivation is key to understanding RSU 57's motivation. This is because Superintendent Davis was the chief executive officer of RSU 57 and it was his "clear, direct and stern" chastisement of Ms. Richard that set in motion the events leading to her filing this law suit.

Superintendent Davis testified that he was frustrated and angry with everyone, including himself. He explained that he thought the adults were blaming the children in the classroom for adult failures, and he emphasized that no one was taking responsibility.

But there is no evidence that Superintendent Davis' testimony on this point is correct. Superintendent Davis' sole and aggressive focus from his first to last words at the December 8, 2014 meeting was exclusively Charlene Richard. There is no evidence that Superintendent Davis directed his criticism during the December 8, 2014 meeting or thereafter to anyone other than Ms. Richard. Superintendent Davis did not criticize Principal Bertinet, Vice Principal Roberts, or any of the members of WES special education professional staff. He demeaned only Ms. Richard, name-calling her as "pathetic", telling her that RSU 57 had wasted ten years on her, and castigating her as "the problem". He made no similar comments about or to anyone else at the meeting or about anyone else involved in the controversy. He directed

Principal Bertinet to issue a memorandum, which became the starting point of RSU 57's campaign against Ms. Richard and was placed in her personnel file. Superintendent Davis issued or directed the issuance of no similar memoranda against any other RSU 57 professional. In short, the Court concludes that Superintendent Davis' explanation of his motivation was patently pretextual.

### 2. The True Reason

This conclusion does not end the Court's analysis. Even if the Court finds, as it has, that RSU 57's proffered explanation—through Superintendent Davis—is pretextual, Ms. Richard still bears the burden to prove that the real reason for RSU 57's adverse action was retaliation for her advocacy for T.K. and L.P. *Palmquist*, 689 F.3d at 71 (The burden shifts back to the employee to show that the proffered reason is "pretextual <u>and that retaliation was the true reason</u>") (emphasis supplied). The Court concludes that Ms. Richard has not met that burden. The Court examined the record to try to understand the impetus behind Superintendent Davis' angry response on December 8, 2014.

### a. Institutional Motivation

There is nothing in RSU 57's special education program or its institutional interest that would have predicted Superintendent Davis' outsized irritation in this case.

First, RSU 57 was bound both by the provisions of law and its own Board policy to refer students suspected of needing special education services for assessments.

Thus, in advocating for T.K. and L.P., Ms. Richard was acting in a manner consistent with both the law and RSU 57 policy.

Second, the Court accepts RSU 57's underlying point that neither T.K. nor L.P., nor T.K. and L.P. together, represented an unusual special education issue for RSU 57. RSU 57 referred more than 120 students for special education services during the 2012-13 school year, over ninety students during 2013-14, and about eighty during 2014-15. During the period from 2011 through 2016, the largest percentage of referrals occurred during the kindergarten year when students were five and six years old. Thus, the numbers do not support Ms. Richard's contention that RSU 57 was institutionally stressed by the presence of special education students and was discouraging special education referrals.

Third, there is no evidence that the specific addition of either T.K. or L.P., or both, to the special education program at RSU 57 would have caused a meaningful budgetary challenge to the District. There is evidence that there could be a cumulative impact of multiple RTI referrals on RSU 57's budget or a specific impact from an unusual student. Superintendent Davis conceded that an unanticipated number of referrals could result in additional cost to RSU 57, requiring a reallocation of the budget and even a financial crunch. *Davis Tr.* 5:9-6:23.

Yet, there is no evidence in this record that RSU 57 was in fact suffering from a budgetary squeeze in 2014-15. To the contrary, as just noted, the number of referred special needs students fell from 120 in 2012-13 to eighty in 2014-15. Nor is there any evidence that there was anything about the characteristics of either T.K.

or L.P. that would have caused RSU 57 any specific budgetary concern. Ms. Richard was seeking additional education technician assistance in her classroom, but there is no evidence in this record that the additional cost of one or two educational technicians would have had a significant impact on RSU 57's budget.

Fourth, RSU 57 had securely in place an administrative and staffing superstructure designed to handle special education students, including a staffed special education program in 2014-15. RSU 57 had employed many of the essential personnel—Susan Prince, the Special Education Director, Joanne Bartlett, the Guidance Counselor, Mary Bellavance, the RTI Coordinator, Carolyn Potter, a special education teacher, and Nicole Winship, the Behavior Specialist, and these employees would have been working on the special education program regardless of whether T.K. and L.P. were added. Similarly, the RTI and the SAT teams were formed and fully staffed as well.

At the same time, there is evidence in the record that RSU 57 was not fully staffed in educational technicians. For example, the Court accepts Ms. Richard's testimony that WES administration periodically pulled Rutharian Gregoire, the educational technician who had been assigned the three students with identified disabilities, out of the classroom, sometimes for days at a time. In December 2014, WES administration assigned Stacy Jette as an additional educational technician to Ms. Richard's class, and the Court accepts Ms. Richard's testimony that with two educational technicians, things settled down in her classroom. But on January 15, 2015, Principal Bertinet announced that "we will need to get back to one ed-tech in

the classroom." *Trial Ex.* 55 at 3. WES administration began removing Ms. Gregoire from Ms. Richard's classroom and ultimately reduced the number of educational technicians back to one, removing Ms. Gregoire and retaining Ms. Jette.

The record, however, leaves the Court unclear why the number of educational technicians—two or one—in Ms. Richard's classroom became such a sticking point between RSU 57 and Ms. Richard. The record reflects that WES administration assigned Rutharian Gregoire to more than one classroom, but it is unclear why. *Id.* 52 ("Starting on Wednesday, I need Ruthie to provide support to a student in Kerry Dunnington's class during the times when the identified students in Charlene's room are receiving specialized instruction"). There is no evidence about the added cost to RSU 57 of one full-time educational technician, especially relative to the District's overall budget, so the Court cannot draw any conclusions on that issue. It may be that there was a scarcity of available educational technicians in the RSU 57 catchment area, but this is speculation. There is a suggestion that the WES administration thought that Ms. Richard should have been able to control a class with one educational technician. *Id.* 55 at 3. ("Christine mentioned that we will need to get back to one ed-tech in the classroom who can help support the identified the [sic] students <u>as well as Charlene taking a more active role with these students with behaviors</u>") (emphasis supplied). But in the end, the record does not allow the Court to make any solid conclusions about the issue of the number of educational technicians in Ms. Richard's classroom.

Finally, Ms. Roberts testified that T.K. was moved to a different classroom at the end of March 2015 and that he has been found to suffer from attention deficit disorder. He was deemed eligible for a Section 504 rehabilitation plan and has been mainstreamed. In addition, after evaluation, L.P. was found eligible for special education services after 2015 and he was placed in a low-ratio classroom. By second grade, both T.K. and L.P. were placed in a low-ratio "hybrid" special education classroom with a regular education teacher, two educational technicians, and a total of eight students. As RSU 57 assessed both T.K. and L.P. and placed them in individualized special education programs, it is less likely that RSU 57 was motivated in its actions against Ms. Richard by her advocacy for the types of programs RSU 57 ultimately provided.

### b.    Individual Motivation: WES Administration

In assessing the motivation of Principal Bertinet and Vice Principal Roberts for engaging in a retributive campaign against Ms. Richard, the Court finds that they were doing the perceived bidding of Superintendent Davis. At the December 8, 2014 meeting and thereafter, it was clear that Superintendent Davis wanted, as he said to Clinton Nash, to find a way to get Ms. Richard to resign her teaching position.

The difference in tone between pre- and post-December 8, 2014 communication from WES administration is striking. Principal Bertinet and Vice Principal Roberts essentially turned from being collaborative and supportive to being accusatory and disciplinary. On November 9, 2014, for example, Principal Bertinet wrote Ms. Richard:

Thanks, Charlene. I appreciate your input and support. Yes, we all need to feel like we're working toward common goals and develop a culture of support and openness.

*Id.* 29. By January 14, 2015, Principal Bertinet was issuing directives:

The following expectations will be reviewed at our meeting during the week of 1/20/15:

1. Email communication
2. Scheduling and down time
3. Conduct with staff
4. Proximity
5. Pre-teaching/coaching of Bx expectations & feedback with students
6. Plan for when out of the classroom.

*Id.* 54. On January 20, 2015, Principal Bertinet accused Ms. Richard of insubordination. *Id.* 60. On January 26, 2015, Principal Bertinet wrote Superintendent Davis:

I'm wondering if we should even meet with Charlene without either your presence or a fellow administrator, as she is contacting Clint and Rob with every email. She has yet to respond to other emails I've sent her and seems to be picking and choosing what to respond to. Your thoughts?

*Id.* 57. By April 6, 2015, Principal Bertinet had placed Ms. Richard on a Corrective Action Plan. *Id.* 84. Later in April, 2015, Ms. Richard took a medical leave of absence from work due to stress.

Having reviewed the record evidence, the Court finds that Principal Bertinet and Vice Principal Roberts were following Superintendent Davis' lead in exerting intense pressure on Ms. Richard from the time of the December 8, 2014 meeting to her April 2015 leave of absence and beyond. Perhaps as newly-appointed administrative executives, Principal Bertinet and Vice Principal Roberts were anxious to prove their worth to Superintendent Davis. But the troubling aspect of

their joining in his campaign against Ms. Richard is that it led them to take unsupported positions against not only Ms. Richard but also against the children who were victims of T.K. and L.P.'s aggressive conduct. The Court cannot explain why Principal Bertinet sought to deflect blame from T.K. to B.D. for hitting a female classmate. It cannot explain why Vice Principal Roberts sought to minimize T.K.'s inappropriate hands-on actions against a female classmate by claiming that he only flipped her belt loops. It cannot explain why Principal Bertinet's and Vice Principal Roberts' sworn recollections of the meeting with B.D.'s parents are so directly contradicted by the contents of the tape recording of that meeting. The actions by WES administration go beyond merely following the Superintendent's wishes. In sum, the evidence suggests that something was going on within the administration of RSU 57 concerning T.K., L.P., B.D., and Charlene Richard, but the Court is not sure what. The Court turns to Superintendent Davis.

### c. Superintendent Davis' Motivation

John Davis dedicated his professional life to public school education. After obtaining his bachelor's degree and teaching in Alaska, Superintendent Davis attended Columbia University obtaining two master's degrees and a Ph.D. Superintendent Davis became RSU 57 Superintendent in 2010 and retired in 2015, when he was succeeded as Superintendent by Larry Malone.

In attempting to determine whether RSU 57 retaliated against Ms. Richard, the Court has focused on Superintendent Davis' motivation in his handling of the December 8, 2014 meeting and his subsequent determination to oust Ms. Richard as

a teacher in RSU 57. This is because Superintendent Davis ran the District. The Court had an opportunity to assess Superintendent Davis during his testimony and found him to be a highly intelligent, articulate, and forceful person. Consistent with this impression, the Court has found that WES chief administrators, Principal Bertinet and Vice Principle Roberts, were doing his bidding when they put a hard administrative squeeze on Ms. Richard. Accordingly, Superintendent Davis' motivation is the key to this case.

Preliminarily, as would be expected, Superintendent Davis had very little direct personal knowledge of what was transpiring at WES and in Ms. Richard's classroom. He largely relied on reports from WES administration to draw his conclusions. For example, in the spring of 2014, Superintendent Davis did not review Ms. Richard's evaluation reports and did not visit her classroom. Instead in his words, Superintendent Davis "relied on the principal" and testified that "Mr. Petersen was the person responsible for that building." *Davis Tr.* 10:7-20.

Charlene Richard first came to Superintendent Davis' attention during the 2013-14 school year when then WES Principal Mark Petersen reported to Superintendent Davis that Ms. Richard was having problems with a transfer student. The specific student was from the Reiche School and Superintendent Davis learned from Mr. Petersen that this student was ultimately moved from Ms. Richard's classroom to another classroom. Based on this experience and prior experience, Superintendent Davis testified that he began to develop concerns about Ms. Richard.

In the fall of 2014, Principal Bertinet told Superintendent Davis that she was concerned that Ms. Richard was sending students to the principal's office on a regular basis for behavioral check-ins. However, there is no evidence that Superintendent Davis focused on Ms. Richard until he received a telephone call from B.D.'s parents during the first week of December, 2014. During his two early December conversations with B.D.'s parents, Superintendent Davis became concerned about the extent of their knowledge about other students in Ms. Richard's classroom and he thought that Ms. Richard may have been "feeding them information." *Id.* 13:2-4. Before the December 8, 2014 meeting, Superintendent Davis had not reviewed any data on the behaviors of the children whose conduct was the source of concern, had not received any data on the actual number of principal office visits from Ms. Richard's classroom, and had not observed Ms. Richard in her classroom. *Id.* 14:13-25. Superintendent Davis had asked Principal Bertinet and her team to observe Ms. Richard's classroom and had received reports that Ms. Richard was having difficulty controlling the students' behavior in her classroom. *Id.* 15:1-17:25.

Given Superintendent Davis' general, supervisory knowledge of what was actually occurring in Ms. Richard's classroom, his conduct of the December 8, 2014 meeting is simply inexplicable. He was accusatory, derogatory, and unprofessional. Even though it is possible that Ms. Richard's advocacy for T.K. and L.P. set off Superintendent Davis, the Court cannot find based on this record that it is more likely than not that his anger was in retaliation for her advocacy. In fact, there is scant evidence that Superintendent Davis was even aware of her advocacy as of the

December 8, 2014 meeting.  For example, the evidence is equivocal at best as to whether, as of the December 8, 2014 meeting, Superintendent Davis was aware that Ms. Richard had completed the SAT paperwork for T.K. and L.P.

If not Ms. Richard's advocacy, then the question is what caused Superintendent Davis to act so angrily and inappropriately against Ms. Richard and to set in motion what followed.  First, it could have been that Superintendent Davis became convinced during his two conversations with B.D.'s parents that Ms. Richard had violated her obligation of professional confidentiality by discussing specifics about T.K. and L.P. with B.D.'s parents.  This was the first issue Superintendent Davis raised about Ms. Richard when he interrupted Principal Bertinet's presentation.  If Ms. Richard had violated the confidentiality rules, it would have been a serious matter.  But there is no evidence she had done so.  Ms. Richard was not the only possible source of information for B.D.'s parents.  Yet, if Superintendent Davis was convinced that Ms. Richard had acted unethically, his view could have colored his assessment of her professionalism.  Again, if so, his angry reaction would not have been in retaliation for her advocacy for T.K. and L.P. and other special education students, but because he thought (probably erroneously) that she had violated their right to confidentiality.

Second, there was some oblique testimony about Superintendent Davis' concern about the kindergarten teachers at WES as a group.  Superintendent Davis testified that he had decided early on that the kindergarten teachers, including Charlene Richard, Eleanor Roberts, Jennifer Elsaessor, and Meredith Bolduc, needed

to be broken up.  He said that he based this view on the advice of Principal Bertinet, and Principal Bertinet confirmed that she was concerned about the need to break up the kindergarten team.  Perhaps, Superintendent Davis together with Principal Bertinet viewed B.D.'s parents' complaints as an opportunity to start to break up this group of kindergarten teachers.  For example, there was evidence that Superintendent Davis came down hard on Ms. Elsaessor on an issue, causing her to become upset in one of their meetings.  But it was never clear what the problem was with the kindergarten teachers as a whole.  If Superintendent Davis acted against Ms. Richard motivated by a desire to break up this group of kindergarten teachers, the Court cannot find, based on this record, that his motivation was caused by Ms. Richard's advocacy for disabled students.

Third, Superintendent Davis may well have thought that Ms. Richard was unfairly targeting T.K. and L.P.  That spring, Superintendent Davis began to develop concerns about Ms. Richard's ability to manage unruly kindergarten students.  Principal Petersen's reports that Ms. Richard had problems with a student or two annually were echoed by Principal Bertinet's reports that Ms. Richard was having problems with T.K. and L.P. in the fall of 2014.  In fact, Superintendent Davis told Ms. Richard that if she could not handle twenty-something, five-year-olds, they would find her a job she could handle.  Superintendent Davis summarized his criticism by saying, "You are the problem, not the boys."  RSU 57's position in this case tracks this view of the record.  RSU 57 says that "[h]aving spent virtually his entire life advocating for students, [Superintendent Davis] was frustrated when it appeared

that Plaintiff was blaming two little boys for problems in her classroom." *RSU 57 Post Tr. Reply* at 12-13.

Even though this is a plausible explanation for Superintendent Davis' conduct on December 8, 2014, the Court finds that he was wrong about Ms. Richard. Superintendent Davis told Ms. Richard that C.S. had never had her hands burned and that she had eczema, and that T.K. had never put his hands down C.S.'s pants, that it "never happened." Based on this record, the Court finds Superintendent Davis was incorrect on these facts. Nor would Superintendent Davis have had any basis for his asserted personal knowledge about what had happened to the children in Ms. Richard's classroom. Later, in a manner consistent with his self-confident view of unknown facts, Superintendent Davis assured B.D.'s parents that B.D. was not being targeted, when in fact B.D. was being targeted, and furthermore, Superintendent Davis implied that B.D. himself was embellishing stories to his parents. Throughout this ordeal, Superintendent Davis was not merely misinformed, but he belittled anyone who disagreed, including B.D.'s parents, C.S.'s parents, even B.D. himself, and of course Charlene Richard.

To be clear, based on this record, the Court finds that Ms. Richard was not targeting either T.K. or L.P. The Court's impression of Ms. Richard as an elementary teacher is extremely positive, consistent with her prior exemplary record at WES and with the accolades of B.D.'s parents. Instead, Ms. Richard was presented with a class of twenty-two kindergarteners and she was concerned that T.K. and L.P. were making her classroom scary and unsafe for her other students. She never sought to

have T.K. or L.P. removed from her classroom. She was seeking an appropriate level of support within the classroom so that all her students, including T.K. and L.P., could have a positive experience in kindergarten, a level of support T.K. and L.P. later actually received at RSU 57.

But Superintendent Davis was either misinformed or he jumped to erroneous conclusions about Ms. Richard. Critically, however, for purposes of this lawsuit, the Court does not find that the Superintendent's mistaken conclusions were caused by Ms. Richard's advocacy for T.K. and L.P. They seem to have been caused by Superintendent Davis' misunderstanding of what was actually happening inside Ms. Richard's classroom, and were not based on his understanding that Ms. Richard was advocating for T.K. and L.P., but on his misimpression that Ms. Richard was blaming T.K. and L.P. for her inability to do her job.

What is surprising is that Superintendent Davis' erroneous views of Ms. Richard persisted and intensified. Commonly, when someone of Superintendent Davis' high level of competence badly overreacts, he or she self-corrects. It is true that in mid-January, 2015, Superintendent Davis asked Ms. Richard. "Do you know what it means to deescalate a situation?" But by then the die was cast. The WES administration had set about proving Superintendent Davis' declared view of Ms. Richard's incompetence. Ms. Richard knew what they were doing and she understandably became extremely defensive. In other words, Superintendent Davis' firmly-held misunderstandings had very real and regrettable consequences for Ms. Richard.

Lastly, the Court may well be incorrect in its analysis of Superintendent Davis' motivation. Absent this explanation, however, the Court finds his conduct inexplicable. In the context of this case, as Ms. Richard has the burden of proof, an absence of probable explanation leaves her case unproven. In sum, because the Court does not find that Ms. Richard has proven it is more likely than not that Superintendent Davis was motivated against her by Ms. Richard's advocacy for disabled students, her retaliation and similar claims against RSU 57 must fail.

## VI. CLOSING THOUGHTS

At the close of the evidence in this case, the Court urged the parties, if they could, to try and settle this case and warned them that, if the Court were required to issue an opinion, it would be compelled to make some harsh judgments about the participants in this most unfortunate matter. The Court regrets having to make unedifying findings about the credibility of some of the professional witnesses. Even so, having taken a measure of the main players in this episode: former Superintendent John Davis, current Superintendent Larry Malone, Principal Christine Bertinet, Vice Principal Melissa Roberts, and Charlene Richard, the Court views them all as dedicated and capable educational professionals. Ironically, in seeking to protect RSU 57 students from unfair targeting, the RSU 57 administration ended up unfairly targeting Charlene Richard, just not unlawfully. To the extent this targeting is still going on, the Court urges RSU 57 to reconsider its treatment of Ms. Richard and to use this trying experience, as good teachers would, to make RSU 57 an even better place to learn and to teach.

## VII. CONCLUSION

The Court DENIES Charlene Richard's Complaint against Regional School Union 57 on all counts and ORDERS that judgment be issued for the Defendant and against the Plaintiff.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 7th day of November, 2017